Homer JARVIS, individually and on be-
half of all others similarly situated,
Petitioner, Appellant,

v.

Leonard W. LEVINE, in his official ca-
pacity as Commissioner of Human
Services, et al., Respondents.

No. C2–86–1633.

Supreme Court of Minnesota.

Jan. 15, 1988.

Charles H. Thomas, Eugenia L. Hedlund, Mankato, Mark A. Bohnhorst, Michael Hagedorn, St. Paul, for appellant.

Mary L. Stanislav, Sp. Asst. Atty. Gen., St. Paul, for respondents.

**1.** Jarvis and the court of appeals refer to the drugs used as "neuroleptics." Respondents and the trial court used the term "antipsychotic." The terms "neuroleptic," "major tranquilizer," "psychotropic" and "antipsychotic" are used interchangeably in the literature to describe this classification of drugs. Although "antipsychotic" is the most widely used term, medical literature suggests that "neuroleptic" is more medically precise in describing the effects, *i.e.*, sedation of the nervous system. *See* Gaughan & LaRue, *The Right of a Mental Patient to Refuse Antipsychotic Drugs in an Institution*, 4 L. & Psychology Rev. 43, 46 (1978). We will follow the court of appeals and use the term "neuroleptic."

## OPINION

YETKA, Justice.

Appellant Homer Jarvis seeks review of a decision of the court of appeals which held that involuntary treatment with neuroleptic drugs was not an intrusive treatment *per se* and thus did not require court approval to administer under the procedural requirements of *Price v. Sheppard*, 307 Minn. 250, 239 N.W.2d 905 (1976). He also seeks review of the court's determination that his claim for post-medication review and damages is moot.

We reverse the court of appeals in part, affirm in part and remand.

### I.

Homer Jarvis was indeterminately committed to the Minnesota Security Hospital in March 1977 as mentally ill and dangerous after the shooting death of his sister. He was convicted of manslaughter for the death and has served and been discharged from his sentence.

During his period of commitment, Jarvis has been involuntarily treated with major tranquilizers or neuroleptic medication [1] four times. This case involves only the most recent course of treatment, which began in December 1984 and ended in September 1985.

The diagnosis of Jarvis' mental illness is not clear. Although the court of appeals concluded that he had been diagnosed as paranoid schizophrenic, the record seems to indicate the more appropriate diagnosis to be paranoid state because Jarvis lacks hallucinations. Jarvis denies that he is ill or requires professional help and believes that hospital personnel and the courts have conspired to commit him indefinitely. He also believes that the medications he receives

are poisoning him. However, Jarvis is articulate and intelligent and his self-care skills are intact. The record contains no evidence that Jarvis is currently violent. The question of involuntary medication in emergency situations is, therefore, *not* before the court. Jarvis has apparently been quite a difficult patient, at times refusing to cooperate in treatment programming, group therapy, individual counseling, or psychological interviews. He has been caustic, derogatory and sarcastic in his interactions with the hospital staff.

### A. *Prior Involuntary Treatment*

Jarvis was first treated with neuroleptic medication (Prolixin) in March 1977, shortly after his commitment. He immediately complained of tremors, blurred vision, tiredness and difficult urination. Jarvis' treating physician, concerned over Jarvis' severe side effects, also doubted that significant progress would be made with medication. He discontinued treatment in the summer of 1978.

In November 1978, a second course of neuroleptic treatment was begun. Because Jarvis' doctor noted "significant side effects" from Prolixin, a different drug (Navane) was used. Jarvis then developed severe akathesia. Akathesia refers to strong subjective feelings of distress or restlessness which cause a compelling need for the patient to be in constant motion. The patient may attempt to obtain relief by constant, repetitive motions primarily of the extremities. *See* Goodman & Gilman, *The Pharmacological Basis of Therapuetics* 405–06 (7th ed. 1985). Because of Jarvis' discomfort, the medication was changed to Serentil. Respondent Dr. Doheny, then a psychiatric consultant, discontinued neuroleptic medication in February 1980 due to Jarvis' "severe akasthisia [sic] and lack of symptoms." Jarvis remained off medications for nearly 1 year. The physical side effects improved and there was apparently no significant deterioration in his mental condition.

In February 1981, a third course of involuntary treatment was begun, continuing until May 1982. By September 1981, Jarvis was strongly requesting discontinuance. Dr. Paul Melchiar, M.D., a psychiatric consultant, found "no clear-cut evidence that he has benefited from medication." In May 1982, Dr. Melchiar concluded that Jarvis was "within his legal rights to refuse medication" and discontinued neuroleptic treatment. Jarvis remained off neuroleptics for 2½ years until December 1984. There is no evidence that it has been necessary to medicate Jarvis in an "emergency" during his periods off medication. The emergency procedures are thus not at issue in the present case.

### B. *Most Recent Course of Treatment*

In November 1984, respondent Dr. Doheny, Jarvis' treating physician, initiated a request for involuntary treatment. The involuntary medication policy contained in the Institutions Manual Guidelines, which was promulgated by the Department of Public Welfare in 1981, was followed because Jarvis refused treatment. Jarvis' claim is based primarily on his contention that the policy procedures do not sufficiently protect his rights under Minnesota and federal law. In addition, he contends that the procedures have not been properly followed in his case and warrant a hearing on his claim for damages.

### C. *Manual Involuntary Medication Policy*

The policy manual sets forth both substantive and procedural requirements for involuntary medication treatment cases.

*Substantive Requirements*

In non-emergency cases before involuntary treatment with neuroleptic drugs may begin, two elements must be established:

a. The patient lacks the ability to engage in a rational decision-making process regarding the acceptance of treatment and is unable to weigh the possible benefits and risks of treatment (the mere fact of disagreement about medication does not in itself constitute evidence of inability); and

b. The patient's behavior has been observed and documented and the patient is found to be suffering from a major men-

tal illness with severe functional incapacity * * *.

Section XII–4030, 2.a., 2.b. After these elements have been established, one of the two following conditions must also be found before treatment can begin:

(1) The patient has a documented history of clearly demonstrated reductions of symptoms during previous treatment with the [drug] and of clearly demonstrated deterioration of function when the [drug] was discontinued; *or*

(2) The nature of the documented behavior of a committed patient is sufficiently severe and of such duration that the known benefits clearly outweigh the possible risks of the medication.

Section XII–4030, 2.c.(1), (2) (emphasis added).

If the second condition has been met, neuroleptics may be administered for a trial period, but:

(a) The trial may not exceed 30 days in length; and

(b) At the end of 30 days the treatment will be evaluated by the treatment team, and if the evaluation establishes the efficacy of the [drug] for that patient (using the criteria in XII–4030, 2.c.(1) above), the treatment team may initiate another request for involuntary administration of the [drug] for that patient.

Section XII–4030, 2.c.(2)(a), (b).

In assessing the risks and benefits of forced medication, the manual requires consideration of "the possible non-physical side effects * * * such as anger, fear, and distrustfulness which may result from involuntary administration of medication." Section XII–4030, 2.c.(3).

*Procedural Requirements*

1. *Documentation and Recommendations of the Treatment Team (Section XII–4050)*

This step requires documentation of factors considered by the treatment team such as medical necessity, an individualized treatment plan, reason for the patient's refusal, past side effects, potential risks and benefits, less intrusive treatments, and

probable courses of treatment without neuroleptics.

2. *Certification of Need for Involuntary Treatment (Section XII–4060)*

The attending physician must also provide a written statement which (1) describes the patient's clinical status, diagnosis and preferred treatment; (2) lists major treatment alternatives considered and reasons for rejecting such alternatives; (3) indicates the patient's expected response; and (4) certifies that criteria for involuntary treatment have been met and procedures completed.

3. *Review and Approval by Facility Treatment Review Panel (TRP) (Section XII–4070)*

The case is then reviewed by the TRP. The TRP is a multidisciplinary group of mental health professionals. It is composed of a licensed physician, the hospital's chief executive officer, the patient advocate, a staff psychologist, social worker and registered nurse. It is recommended that, to reduce any conflict of interest, a member of the particular patient's treatment team not serve on the review panel.

In non-emergency cases, the TRP decides whether the substantive and procedural requirements of the manual have been followed and whether the patient's wishes should be overruled pursuant to those standards. The TRP may approve or disapprove medication and set conditions on its approval. A written summary is required. Either the attending physician or the patient may appeal the TRP decision to the facility medical director, who makes the final decision. The TRP's decision is, therefore, non-binding and may be overridden by the medical director.

4. *Review by Hospital Review Board (Section XII–4080)*

The board determines whether procedural requirements were followed "and the extent to which the rights and dignity of the patients were considered and protected." The board makes recommendations to the Commissioner of Human Services. The

board is not responsible for assessment of the clinical decision and also cannot override the medical director.

### D. *Involuntary Medication Policy as Applied*

The following is a summary of how the involuntary medication policy was applied to Jarvis.

1. September 27, 1984: Dr. Doheny presents Certificate of Need for Involuntary Treatment to TRP.
2. October 10, 1984: TRP disapproves request for involuntary medication of Jarvis by Dr. Doheny.
3. October 18, 1984: Doheny appeals TRP decision to Medical Director Dr. Gottlieb. TRP agrees to reconsider proposal.
4. October 25, 1984: TRP again disapproves medication.
5. October 30, 1984: Dr. Doheny appeals TRP disapproval to Dr. Gottlieb. Appeal is untimely.
6. November 13, 1984: Hospital Review Board affirms TRP decision. Gottlieb accepts their recommendation.
7. November 27, 1984: Second request for involuntary medication by Doheny.
8. November 28, 1984: TRP again disapproves involuntary medication.
9. November 29, 1984: Doheny appeals to Gottlieb.
10. December 5, 1984: Gottlieb overrules TRP recommendation and allows involuntary medication.
11. December 6, 1984: Jarvis injected with neuroleptic (Prolixin).
12. December 7, 1984: Hospital Review Board affirms TRP disapproval.
13. December 7, 1984: Gottlieb acknowledges, but does not implement board recommendation.
14. January 30, 1985: TRP reaffirms disapproval of medication.
15. February 6, 1985: Gottlieb overrules TRP recommendation.

The TRP again reiterated its disapproval of medication on April 3, 1985; May 29, 1985; and July 31, 1985. Following that date, the record is not clear, but in September 1985, the acting medical director reviewed the latest TRP appeal and discontinued further medication.

In sum, the TRP determined, on seven occasions, that involuntary neuroleptic treatment of Jarvis was unwarranted. The TRP determined that the potential for serious side effects outweighed the possible benefits in Jarvis' case. The TRP also found no "history of clearly documented reduction of symptoms" with past medication. Despite these findings and recommendations, Jarvis was forcibly medicated for 9 months.

### II.

Jarvis commenced this action for damages pursuant to 42 U.S.C. § 1983 and for declaratory and injunctive relief. Although Jarvis initially sought relief on behalf of himself and others similarly situated, he failed to move the trial court to certify the class.

Jarvis' complaint asserted four claims: (1) that respondents failed to comply with the involuntary medication policy established by the Minnesota Department of Human Services (DHS), (2) that respondents' failure to follow the policy violated Jarvis' constitutionally protected rights of privacy and liberty, (3) that the failure to comply violated Jarvis' statutory right to treatment, and (4) that forcible administration of neuroleptic medication without prior judicial review violated Jarvis' rights to due process of law.

Respondents moved for summary judgment on all counts. Jarvis moved for partial summary judgment on only the fourth count concerning the right to premedication judicial review.

The trial court granted respondents' motion and denied Jarvis' motion, and judgment was entered. On appeal, the court of appeals affirmed the judgment with some modification. *Jarvis v. Levine,* 403 N.W.2d 298 (Minn.App.1987)

The court of appeals held that involuntary treatment with neuroleptic drugs was not an intrusive treatment *per se* and, therefore, did not require premedication judicial review under *Price v. Sheppard,* 307 Minn. 250, 239 N.W.2d 905 (1976). The court held that a committed mental patient has only a "qualified right" to refuse neuroleptic treatment under both Minnesota and federal law. The court further held that the exercise of "professional judgment" by hospital personnel, after compliance with DHS mandatory guidelines, was sufficient procedural protection. The court modified the judgment, however, concluding that a right to post-medication review exists. Finally, the court found Jarvis'

claim for damages inappropriate as a matter of law. This court granted Jarvis' petition for further review.

The issues raised on appeal are:

(1) Does involuntary neuroleptic treatment of involuntarily committed mental patients constitute intrusive treatment under *Price v. Sheppard?*

(2) Does Minnesota law establish substantive rights of committed patients which exceed a federal constitutional minimum?

(3) Did the court of appeals err when it held that Jarvis' claim for post-medication review and damages were moot?

The ultimate issue underlying this case is whether state medical personnel may forcibly administer neuroleptic[2] medication in *non*-emergency situations to a committed patient who refuses consent without prior court approval. Neither the United States Supreme Court nor this court has directly addressed this question. However, 12 years ago, in *Price v. Sheppard,* 307 Minn. 250, 239 N.W.2d 905 (1976), this court recognized that "intrusive" forms of treatment seriously infringe upon a committed mental patient's right of privacy. The court recognized that some treatment decisions could be left to the medical judgment of hospital officials without unduly infringing on a patient's rights. However, because the potential impact of the more intrusive forms of treatment can be so severe, the court refused to leave those decisions solely within the discretion of medical personnel. *Id.* at 262, 239 N.W.2d at 912–13. The court, therefore, established pre-treatment judicial review procedures to be used before the imposition of "intrusive" forms of treatment on non-consenting patients:

(1) If the patient is incompetent to give consent or refuses consent or his guardian other than persons responsible for his commitment also refuses his consent, before more intrusive forms of treatment may be utilized, the medical director of the state hospital must petition the probate division of the county court in the county in which the hospital is located for an order authorizing the prescribed treatment;

(2) the court shall appoint a guardian ad litem to represent the interests of the patient;

(3) in an adversary proceeding, pursuant to the petition, the court shall determine the necessity and reasonableness of the prescribed treatment.

*Id.* at 262, 239 N.W.2d at 913 (footnotes omitted).

*Price* also enunciated the criteria to be utilized by the probate courts in determining the necessity and reasonableness of the proposed treatment:

In making that determination the court should balance the patient's need for treatment against the intrusiveness of the prescribed treatment. Factors which should be considered are (1) the extent and duration of changes in behavior patterns and mental activity effected by the treatment, (2) the risks of adverse side effects, (3) the experimental nature of the treatment, (4) its acceptance by the medical community of this state, (5) the extent of intrusion into the patient's body and the pain connected with the treatment, and (6) the patient's ability to competently determine for himself whether the treatment is desirable.

*Id.* at 262–63, 239 N.W.2d at 913 (footnote omitted).

The form of treatment at issue in *Price* was electroconvulsive therapy (ECT) which the court found to be one of the most intrusive forms of treatment. *Id.* at 260, 239 N.W.2d at 912. The court also recognized that treatment techniques can "range in degree of severity and coerciveness from the least intrusive forms such as milieu

---

**2.** As noted *supra* p. 140, fn. 1, the terms "neuroleptic," "antipsychotic," "psychotropic," and "major tranquilizer" are used interchangeably. These are commonly phenothiazines (*e.g.,* Thorazine, Vesprin, Serentil, Prolixin), thioxanthenes (*e.g.,* Navane) and other heterocyclic compounds (*e.g.,* Haldol). Goodman & Gilman, *The Pharmacological Basis of Therapuetics* 391–408. We stress that our holding today is confined to this particular classification of drugs and does not apply to "minor" tranquilizers.

therapy * * * and psychoanalysis, to drug, aversion, or electroconvulsive therapy, and ultimately to psychosurgery." *Id.* at 260, 239 N.W.2d at 911.

The holding was limited to psychosurgery and ECT:

We cannot draw a clear line between the more intrusive forms of treatment requiring this procedural hearing and those which do not. Certainly this procedure is not intended to apply to the use of mild tranquilizers or those therapies requiring the cooperation of the patient. On the other hand, given current medical practice, this procedure must be followed where psychosurgery or electroshock therapy is proposed.

*Id.* at 263, 239 N.W.2d at 913.

█ Thus, the question whether similar procedures are necessary before neuroleptic drugs can be involuntarily administered was expressly left open by *Price.* Jarvis argues that the involuntary administration of neuroleptics constitutes "intrusive" treatment, requiring the procedures established by *Price* to be followed. We agree.

The *Price* opinion did not set out an analytic framework for determining in the first instance whether a particular type of treatment technique is intrusive, thereby triggering its procedural requirements. In the present case, the court of appeals did not directly address this question.

The court of appeals did acknowledge the potentially serious side effects of neuroleptics. The court concluded, however, that neuroleptics are not intrusive *per se* apparently because these effects can vary widely among patients, type of drug and dosage. *Jarvis,* 403 N.W.2d at 308. Without any real analysis, the court found only that neuroleptics do "not clearly rise to the level of intrusiveness of electroshock treatments or psychosurgery." *Id.* For the reasons set out below, we disagree.

A. *Intrusiveness of Neuroleptic Drugs*

One of the principal considerations in the *Price* holding that ECT was "intrusive" therapy was the risk of side effects and permanent damage to the patient. We noted: "As the techniques increase in severity, so do the risks of serious and long-lasting psychological or neurological damage." *Price,* 307 Minn. at 260, 239 N.W.2d at 912 (footnote omitted). The court listed "the risks of adverse side effects" and "the extent of intrusion into the patient's body and the pain connected with the treatment" as factors to be considered in determining whether ECT or psychosurgery is necessary. *Id.* at 262–63, 239 N.W.2d at 913.

Because the privacy interest protected was described by the court as "the concept of personal autonomy," *id.* at 257, 239 N.W.2d at 910, a reasonable starting point in any analysis of "intrusiveness" would be the probable effects of the particular therapy on the patient's body.

In the case of neuroleptics, the likelihood of at least some temporary side effects appears to be undisputed.

The most common results are the temporary, muscular side effects (extra-pyramidal symptoms) which disappear when the drug is terminated; dystonic reactions (muscle spasms, especially in the eyes, neck, face, and arms; irregular flexing, writhing or grimacing movements; protrusion · of the tongue); akathesia (inability to stay still, restlessness, agitation); and Parkinsonisms (mask-like face, drooling, muscle stiffness and rigidity, shuffling gait, tremors). Additionally, there are numerous other nonmuscular effects, including drowsiness, weakness, weight gain, dizziness, fainting, low blood pressure, dry mouth, blurred vision, loss of sexual desire, frigidity, apathy, depression, constipation, diarrhea, and changes in the blood.

Plotkin, *Limiting the Therapeutic Orgy: Mental Patients' Right to Refuse Treatment,* 72 Nw.U.L.Rev. 461, 475–76 (1977) (footnotes omitted). *See also* Gutheil & Appelbaum, *"Mind Control," "Synthetic Sanity," "Artificial Competence," and Genuine Confusion: Legally Relevant Effects of Antipsychotic Medication,* 12 Hofstra L.Rev. 77, 99–117 (1983); Gaughan & LaRue, *The Right of a Mental Patient to Refuse Antipsychotic Drugs in an In-*

*stitution,* 4 L. & Psychology Rev. 43, 51–52 (1978).

Many of these side effects can properly be described as relatively minor and of a temporary duration. However, on rare occasions, other more serious non-muscular side effects, such as skin rashes, ocular changes, cardiovascular changes and sudden death, have been documented. Plotkin, *supra,* at 476.

A more serious concern with the use of neuroleptics is the possibility, acknowledged in this case, of the patient developing tardive dyskinesia.[3] Tardive dyskinesia is a neurological condition that is permanent and irreversible. No satisfactory treatment exists. It is characterized by involuntary muscle movements such as chewing, blowing, or licking motions, but may also involve involuntary movement of other areas of the body. While some cases are mild, tardive dyskinesia can be life-threatening. In extreme instances, speech may be incomprehensible, and swallowing and breathing may be seriously impaired. *See* Plotkin, *supra,* at 476–77.[4]

The underlying rationale in the *Price* case holding that ECT was intrusive was our concern over the risk of permanent physical damage. Clearly, the risks of tardive dyskinesia alone, even if other temporary side effects are discounted, could warrant placing neuroleptics in the same category as ECT.[5] Other state courts have not been hesitant about classifying neurolep-

tics with ECT and psychosurgery as intrusive based primarily on their assessments of the drugs' potentially devastating side effects. For example, the Oklahoma Supreme Court classified neuroleptics as an "organic therapy," along with ECT and psychosurgery, seeing all three as "intrusive in nature and an invasion of the body." *K.K.B.,* 609 P.2d at 749. Similarly, Massachusetts treated neuroleptics "in the same manner we would treat psychosurgery or electroconvulsive therapy." *Roe,* 383 Mass. at 437, 421 N.E.2d at 53.

As the court of appeals noted, the risks can and do vary greatly, depending on such factors as the specific drug used, dosage, duration of treatment, and age of patient. *Jarvis,* 403 N.W.2d at 308. In our view, however, the likelihood of some potentially devastating side effects is both sufficiently significant and well established to support a finding of intrusiveness.[6]

### B. *Validity of Price v. Sheppard*

The court of appeals discussed *Price* as the proper standard applicable before use of intrusive treatment techniques, but concluded that neuroleptics were not intrusive *per se. Jarvis,* 403 N.W.2d at 308. As we have already stated, we disagree with the court's conclusion regarding intrusiveness. Respondents do not directly address the issue of intrusiveness. They argue instead that *Price* is no longer the correct standard to be used as an analytic framework for

---

3. In July 1985, the TRP expressed concern that Jarvis' medical records indicated the possibility that he was developing the disorder. Nevertheless, medication continued until September. The percentage of patients who will develop tardive dyskinesia cannot be accurately predicted. Respondents, however, estimate its incidence as between 5% and 40% of patients receiving neuroleptics. The Indiana Supreme Court concluded recently that the possibility of developing the condition was 50%. *In re Mental Commitment of M.P.,* 510 N.E.2d 645, 646 (Ind. 1987).

4. For further discussions on the side effects of neuroleptics, *see Davis v. Hubbard,* 506 F.Supp. 915, 928–29 (N.D.Ohio 1980); *M.P.,* 510 N.E.2d at 646; *In the Matter of Guardianship of Roe,* 383 Mass. 415, 436–40, 421 N.E.2d 40, 52–54 (1981); *In re K.K.B.,* 609 P.2d 747, 748–49 (Okla. 1980).

5. Interestingly, the literature which documents the large variety of side effects of neuroleptics lists only potential short-term or long-term memory loss as the most likely serious effect of ECT. While there is some evidence that ECT may also cause permanent brain damage, the studies cited appear to be inconclusive. The evidence regarding neuroleptics is much more well established. Plotkin, *supra,* at 472–73.

6. Indeed, the State Department of Public Welfare, in Informational Bulletin # 87–55C dated August 31, 1987, acknowledged that antipsychotic medication is associated with tardive dyskinesia. The bulletin further noted that the disorder "can be severe, * * * cosmetically disfiguring or life threatening."

the proper procedures required before intrusive treatment can be involuntarily used.

In brief, respondents argue that *Price* was based solely on the right of privacy under the federal Constitution. The court balanced the patient's right to personal autonomy against the interests of the state, concluding that the state must use the least restrictive means when intrusive treatments are proposed to mitigate the impact on the patient's rights. *Price*, 307 Minn. at 257, 239 N.W.2d at 910. The *Price* opinion cited only federal privacy cases. Therefore, respondents argue, the court interpreted the *federal* Constitution as requiring the least intrusive means in the treatment of committed mentally ill patients.

However, the United States Supreme Court has subsequently determined that, at least in some circumstances, under the federal Constitution, a patient's rights are adequately protected if professional judgment is exercised by the treating physician. *Youngberg v. Romeo,* 457 U.S. 307, 321, 102 S.Ct. 2452, 2461, 73 L.Ed.2d 28 (1982). The Court determined that professional judgments are entitled to a presumption of validity and found "no reason to think judges or juries are better qualified than appropriate professionals in making such decisions." *Id.* at 323, 102 S.Ct. at 2462.

*Youngberg* did not resolve the question before this court today. The case involved a severely retarded individual committed to a state facility who filed suit for damages and injunctive relief under the federal Constitution. The patient, having the mental capacity of an 18–month–old baby, was obviously unable to participate in any treatment decisions. *Youngberg* also did not raise the issue of forced drug treatment and its potentially devastating effects, but, instead, involved rights to safe physical conditions, habilitation and freedom from bodily restraint. The significant differences between the factual and legal issues addressed in *Youngberg* and those raised today convince us that the case furnishes little guidance.

In addition, we are faced with the rights of persons committed to Minnesota institutions, pursuant to Minnesota law, by the courts of this state. Given the significant state law issues involved, we feel it is imperative to assume our obligation to be "independently responsible for safeguarding the rights of [our] citizens." *State v. Gray,* 413 N.W.2d 107, 111 (Minn.1987) (citations omitted). We thus decide the case exclusively under Minnesota statutes and our Minnesota Constitution.

The essential question in this entire case then is whether the policy and procedure outlined in this court's decision of *Price v. Sheppard, supra,* is still valid today and whether it should be applied to the use of neuroleptic drugs in these circumstances. We hold that the *Price* procedure should apply in all future cases.

### III.

At oral argument, the assistant attorney general contended that the court should not interfere with the proposed method of treatment between physicians and their patients. The state also argued that people committed to mental institutions are committed for the specific purpose of receiving treatment and, therefore, are different than people in free society. However, what counsel forgot is that the patient is in a state mental institution only because he or she was first committed by a court of law of this state.

The court's responsibility for the patient does not end at commitment. Commitment to an institution does not deprive an individual of all legal rights, *see* Minn. Stat. § 253B.23, subd. 2 (1986), especially fundamental rights guaranteed by our Constitution. It would be both unreasonable and unnecessary for the courts to become involved in every post-commitment treatment decision; however, it is equally clear that the courts cannot abdicate *all* responsibility for protecting a committed person's fundamental rights merely because some degree of medical judgment is implicated. When medical judgments collide with a patient's fundamental rights, as in this case,

it is the courts, not the doctors, who possess the necessary expertise.

Indeed, the final decision to accept or reject a proposed medical procedure and its attendant risks is ultimately *not* a medical decision, but a personal choice. The practice of the various professions has been vastly changed in the past quarter of a century. The public has been unwilling, quite properly, to allow professionals such as lawyers, doctors, dentists and others a completely free hand in handling either a client, customer or patient's case. Administering to a patient today may be more accurately described as a team effort on the part of both the doctor and the patient. It is a doctor's obligation to explain to the patient the diagnosis and proposed method of treatment. The informed patient then decides whether to consent to the treatment in whole or in part. The doctor may recommend, but does not dictate the final decision.

Unless extraordinary circumstances exist, a competent person has the right to refuse to accept the type of intrusive treatment recommended here. An institutionalized patient should have the same right as one in a free and open society. To deny mentally ill individuals the opportunity to exercise that right is to deprive them of basic human dignity by denying their personal autonomy.[7]

There is a right to privacy under the Constitution of Minnesota. *See State v. Gray*, 413 N.W.2d 107 (Minn.1987). The right begins with protecting the integrity of one's own body and includes the right not to have it altered or invaded without consent. Commitment to an institution does not eliminate this right. When intrusive treatment is proposed, the "professional judgment" of medical personnel insufficiently protects this basic human right. While Jarvis' doctors have his best interests at heart, we recall that mental patients in the past have been used as tools for experimentation and new techniques. Many of the atrocities committed in Nazi Germany were allegedly carried out under the guise of "improving" medical science. We certainly do not mean to suggest that anything similar has occurred here. Nevertheless, we want to insure that such an opportunity never arises in this state. Therefore, we hold that the procedure outlined in *Price v. Sheppard, supra*, must still be followed in this state not only in the case of psychosurgery or electroshock treatments, but also in the use of these neuroleptic drugs.

This holding is specifically made under Minn. Const. art. I, §§ 1, 2, 10 and not pursuant to any law or provision of the United States Constitution. We understand the argument is made that *Price v. Sheppard, supra*, was written at an earlier time, when the right of privacy was not clearly defined under the Minnesota Constitution. We, therefore, addressed the issues in *Price* only under the United States Constitution. However, we have subsequently recognized an independent right of privacy under the Minnesota Constitution. *See State v. Gray*, 413 N.W.2d 107 (Minn. 1987). Protection of the state right of privacy would require the same procedures we established in *Price*. Although judicial

---

7. In fact, mentally ill persons may be competent to make some medical decisions. *See Davis v. Hubbard*, 506 F.Supp. 915, 935 (N.D.Ohio 1980) ("[T]here is no necessary relationship between mental illness and incompetency which renders [the mentally ill] unable to provide informed consent to medical treatment."). Minn.Stat. § 253B.03, subd. 6 (1986) expressly grants patients the right to consent to all medical and surgical treatment except for treatment of mental illness. However, with that limited exception, mentally ill patients are presumed to be legally competent. *See* Minn.Stat. § 253B.23, subd. 2(a) (1986).

In our view, a finding of legal incompetence is a prerequisite to involuntary medication with neuroleptics. This appears to be consistent with section XII–4030, 2.a. of the Institutions Manual Guidelines, *supra*, at 142. However, a mere finding of incompetence is insufficient to warrant forcible medication. The court must still conduct a so-called *Price* hearing to determine the necessity and reasonableness of the treatment.

For an excellent analysis of the types of factors to be considered in deciding whether or not to override an incompetent patient's refusal, see Beck, *Right to Refuse Antipsychotic Medication: Psychiatric Assessment and Legal Decision-Making*, 11 Mental & Physical Disability L.Rep. 368 (1987).

recognition of a constitutional right of privacy in Minnesota may be relatively recent, the protection of bodily integrity has been rooted firmly in our law for centuries. In *Minnesota Bd. of Health v. City of Brainerd,* 308 Minn. 24, 241 N.W.2d 624 (1976), *appeal dismissed,* 429 U.S. 803, 97 S.Ct. 35, 50 L.Ed.2d 63, we recognized the origin of this concept: "No right is held more sacred, or is more carefully guarded, by the common law, than the right of every individual to the possession and control of his own person, free from all restraint or interference of others, unless by clear and unquestionable authority of law." *Id.* at 36, 241 N.W.2d at 631 (citation omitted). This opinion should erase any doubt that *Price* is based upon principles of the Minnesota Constitution, principles which remain valid today.

This ruling will surely cause some additional limitations on the freedom of physicians to treat their patients in mental institutions. However, because the vast majority of patients and their families and guardians cooperate with treatment, this decision will likely affect a small number of patients in our institutions. In any event, the result is no different than restrictions placed on other professionals. Lawyers, architects, and engineers, for example, are greatly restricted in the exercise of their professional judgments by various rules and regulations. Nonetheless, the limitations imposed are accepted. Similarly, competent, ethical physicians should not object to having some restrictions placed on unlimited means of treatment.

We note that the state has already greatly limited a doctor's discretion to treat a patient forcibly by adopting the existing review process. In the 11 years since *Price v. Sheppard* was decided, the department appears to have made a commendable attempt to give the patient's wishes serious consideration. The question may then be raised as to why these elaborate rules should exist if their application must still be made subject to court approval. However, it is obvious to us that the system will not work if the medical director can overrule the advice of these boards in almost every instance. In Jarvis' case, that is precisely what occurred. The result is that the superstructure, while commendable in form, is rendered meaningless in substance unless further procedural protections are required.

If a treating physician cannot get the approval of his or her peers for the proposed treatment, serious questions arise regarding the reasonableness and necessity of the treatment plan. The mere fact that the medical director supports the physician is insufficient. Court approval in such cases may indeed be difficult to obtain, but is necessary. The serious invasion of personal autonomy which results should be ordered by a court rather than a doctor. If, on the other hand, both the treatment review panel and the hospital review board approve of the proposal by the treating physician, court approval should be quickly forthcoming with little difficulty. Moreover, once such court approval has been obtained, the physician and the hospital are completely free from liability.

As we pointed out in *Price,* the method of treatment can be outlined and consent given at the time of the original commitment. After commitment, the patient's attorney should be kept informed at all times of any proposed changes in treatment. *See Matter of Harhut,* 385 N.W.2d 305, 312 (Minn.1986). Moreover, state law requires judicial hearings at intervals of 6 or 12 months. *Id.* at 309; Minn.Stat. § 253B.13 (1986). In many cases then, treatment approval hearings may be consolidated with hearings already required. Therefore, the necessity for separate hearings to administer these drugs should occur in relatively few instances. Given the potential intrusion on a patient's fundamental rights, however, any additional burden on the state is warranted.

## IV.

Insofar as the suit for damages in this case is concerned, we agree with the decision of the trial court that there is no cause of action. The parties involved followed the established procedures outlined by the state in the handling of mental

**150**

institutions and are thus immune from liability. *Dilmore v. Stubbs*, 636 F.2d 966, 968–69 (5th Cir.1981); *see also Harlow v. Fitzgerald*, 457 U.S. 800, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982). In all future cases, however, prior judicial approval must be obtained.

In summary, we hold that the Minnesota Constitution guarantees a right of privacy. Where such a right is infringed upon by intrusive medical treatment, such as involuntary administration of neuroleptic drugs, the Minnesota Constitution guarantees certain procedural protections as delineated in *Price v. Sheppard, supra.* Thus, medical authorities seeking to treat Jarvis involuntarily with neuroleptic drugs must obtain pre-treatment judicial review. However, as to the failure of respondents to obtain judicial review in the past, prior to treating Jarvis, respondents are not liable for damages because they followed statutory procedures which were presumptively constitutional until today.

The court of appeals is affirmed in part, reversed in part and the case is remanded to the trial court for any action needed to conform with this opinion.

KELLEY, J., concurs specially.

POPOVICH, J., took no part in the consideration or decision of this matter.

KELLEY, Justice (concurring specially):

I concur in the court's opinion insofar as it is based upon Minnesota Statutes and a long line of our cases protecting the bodily integrity of our citizens. Those statutes and our common law cases, as well as our relatively recent case of *Price v. Sheppard*, 307 Minn. 250, 239 N.W.2d 905 (1976), afford more than sufficient support for the majority's conclusion. Therefore, I write only to note that I do not join in that part of the majority opinion, which, in my opinion, unnecessarily purports to base the decision on Sections 1, 2, and 10 of the Minnesota Constitution.