**In re the Matter of Ronald STEEN, Sr.**

No. C3-88-2410.

Court of Appeals of Minnesota.

March 21, 1989.

Kim A. Pennington, Schroeder, Pennington & Lies, St. Cloud, for appellant Steen.

Hubert H. Humphrey, III, Atty. Gen., Mary L. Stanislav, Sp. Asst. Atty. Gen., St. Paul, for respondent Minn. Sec. Hosp.

Gerald W. Von Korff, Rinke–Noonan, St. Cloud, for guardian ad litem.

Heard, considered and decided by WOZNIAK, C.J., and LANSING and IRVINE,* JJ.

## OPINION

LANSING, Judge.

Ronald Steen appeals from an order of the Douglas County District Court authorizing the Minnesota Security Hospital to treat him involuntarily with neuroleptic medication. We affirm in part and reverse and remand in part.

## FACTS

Appellant Ronald Steen is a mentally ill and dangerous individual, who was committed in 1986 to the Minnesota Security Hospital (MSH) at St. Peter, Minnesota. Dr. Charles VanValkenburg, Steen's primary psychiatrist at MSH since January 1988, has diagnosed Steen as suffering from paranoid schizophrenia.

In August 1988 the Treatment Review Panel (TRP) at MSH met to consider a request by Dr. VanValkenburg to treat Steen with neuroleptic medications. Steen was not represented by counsel or a guardian ad litem during the TRP proceedings. The TRP approved a 30–day administration of neuroleptic medications.

The director of MSH petitioned the district court for authorization to involuntarily treat Steen with neuroleptic medications,

pursuant to the Minnesota Supreme Court's decision in *Jarvis v. Levine,* 418 N.W.2d 139 (Minn.1988). The court conducted a *Jarvis* hearing, but did not appoint an independent examiner. The court did appoint a guardian ad litem for the *Jarvis* hearing.

Dr. VanValkenburg testified that he would like to administer up to 100 milligrams per day of Haloperidol, or an alternative equivalent neuroleptic, by mouth or injection. Dr. VanValkenburg stated that, if this proved unsuccessful, he would like to use Haloperidol Decanoate up to 200 milligrams per month. Dr. VanValkenburg did not request a specific period of neuroleptic treatment.

Following the hearing, the court issued an order authorizing MSH to administer an unlimited amount of neuroleptic medication for a six-month period.

## ISSUES

1. Did the trial court err by failing to appoint an examiner for the *Jarvis* hearing?

2. Did the trial court err by authorizing an unlimited level of neuroleptic medication for a six-month period?

3. Was Steen improperly deprived of counsel and a guardian ad litem during the Treatment Review Panel proceedings?

## ANALYSIS

### I.

In *Price v. Sheppard,* 307 Minn. 250, 239 N.W.2d 905 (Minn.1976), the supreme court determined that when an involuntarily committed patient is incompetent to give consent or refuses consent, the following procedures must be followed before "intrusive" forms of treatment are utilized:

(1) * * * [T]he medical director of the state hospital must petition the probate division of the county court in the county in which the hospital is located for an order authorizing the prescribed treatment;

---

* Acting as judge of the Court of Appeals by appointment pursuant to Minn. Const. art. 6, § 2.

(2) the court shall appoint a guardian ad litem to represent the interests of the patient;

(3) in an adversary proceeding, pursuant to the petition, the court shall determine the necessity and reasonableness of the prescribed treatment.

*Id.* at 262, 239 N.W.2d at 913. In *Jarvis v. Levine*, 418 N.W.2d 139 (Minn.1988), the supreme court held that involuntary administration of neuroleptic medication in non-emergency situations is similarly "intrusive," requiring prior judicial approval following the procedures in *Price.*

In response to *Jarvis,* the 1988 Minnesota Legislature amended Minn.Stat. § 253B.17, subd. 1 (1986), to allow a patient to petition the court for a hearing on the administration of neuroleptic medication. 1988 Minn.Laws ch. 689, art. 2, §§ 119–20. The statute as amended specifies that in connection with the petition, the trial court must appoint an examiner.[1] On request, the court must also appoint a second examiner of the patient's choice.

*In re Jarvis,* 433 N.W.2d 120 (Minn.Ct. App.1988) (*Jarvis II*), held that the right to a second examiner on request applies also when a petition is brought by treating professionals:

All *Jarvis* petitions to initiate involuntary administration of medications will, necessarily, be brought by treating professionals. However, the legislature has specified that patients may also bring medication issues before the courts and obtain a second examiner in connection with such hearings. By respondent's analysis, the patient would not be entitled to an examiner at a hearing for authorization to initiate medications. However, the patient could bring his own petition challenging the administration of medications at virtually the same time, and pursuant to the statute, would be then entitled to the appointment of a second examiner for purposes of that hearing. In effect, two hearings would

be required, instead of the single one mandated by *Jarvis.*

The result urged by respondent ignores the legislative policy which guarantees the patient's right to an independent examiner throughout the commitment process. The supreme court did not intend that the *Jarvis* hearing be a mere "rubber stamp" for treatment decisions made by the hospital. The statutory amendment reflects the legislature's apparent recognition that the availability of a second examiner is critical to meaningful court review of a petition for involuntary administration of neuroleptic medications.

*Id.* at 123.

The rationale for extending the requirement of an examiner is clear: physicians may have differing views on whether neuroleptic medications are necessary, and the courts should be as informed as possible in providing review. We conclude the trial court was required to appoint an examiner for Steen's *Jarvis* hearing. Failure to do so is reversible error and compels remand for a new hearing.

Because we remand on this issue, we do not address Steen's argument that the evidence was insufficient to support the court's order authorizing administration of neuroleptic medication. However, we will address the parties' arguments on the specificity of the court's order because this issue will recur on remand.

## II.

◼ Neither *Price* nor *Jarvis* determined the specificity required in a trial court's order authorizing the administration of neuroleptic medications. Steen argues that the court erred by authorizing MSH to administer neuroleptic medication for six months without limiting the level of that medication.

We agree that the trial court's selection of a six-month period is unsupported by any evidence in the record. Neither the medical director in his petition, nor Dr.

---

1. An "examiner" is "a licensed physician or a licensed consulting psychologist, knowledgeable, trained and practicing in the diagnosis and treatment of the alleged impairment." Minn. Stat. § 253B.02, subd. 7 (1988).

VanValkenburg in his affidavit or testimony, requested a six-month course of treatment, and the TRP limited its approval to a 30–day trial period.

The court also failed to adequately define the course of treatment it intended to authorize. The *Price* court recognized that a trial court must balance a patient's need for treatment with neuroleptic medications against the intrusiveness of that treatment. *Price,* 307 Minn. at 262–63, 239 N.W.2d at 913. The level of intrusion of neuroleptic medications is related to the levels and dosages administered and the different types of neuroleptic medications attempted. As the *Jarvis* court recognized:

> The risks [of neuroleptic medications] can and do vary greatly, depending on such factors as the specific drug used, dosage, duration of treatment, and age of patient.

*Jarvis,* 418 N.W.2d at 146. Dr. VanValkenburg stated in his affidavit:

> 4. There are several major chemical classes of antipsychotic medications. Although these medications are chemically different, they all have the unique pharmacologic property of alleviating the symptoms of major mental illness. Within the individual classes of medications there may be differences in the efficacy and side effects experienced by the individual.
>
> \*  \*  \*  \*  \*  \*
>
> 15. The effects of antipsychotic medications vary with the psychiatric condition, the symptoms, and the particular patient. Variability in patients' response may occur largely because of differences in the patient's absorption and metabolic handling of the drug. \* \* \*
>
> 16. In choosing a particular antipsychotic medication to administer to a patient who has previously been treated with medication, these factors are important: the patient's past response to medication, the history of relapse without medication, and past experience with side effects from medication.
>
> 17. Where the patient has not previously been administered antipsychotic medication, a clinical trial of medication must be conducted. A trial could involve the consecutive use of several different agents for a four to six month period. The kind of agents used and the length of the trial will vary depending upon the severity of the patient's symptoms and side effects. In an attempt to maximize benefits and minimize side effects, the physician may need to try more than one medication.
>
> 18. Patients may be differentially sensitive to a drug. Different patients need different dosages of a particular drug. Some patients may need a high dosage of a drug because of poor individual response, severe symptoms or other factors which reduce the effectiveness of the medication.

The state argues that the order should be affirmed because medical personnel, not the courts, should make final determinations on the types and levels of medications to be administered. We agree that the orders, based on professional medical judgments, should be sufficiently flexible to allow for modifications of levels and/or substitutions of equivalent types of drugs, but we cannot agree with the state's claim that *Jarvis* contemplated the use of open-ended orders on duration and levels of unspecified medications. We read *Jarvis* to permit the flexibility required by medical diagnosis and treatment, but also to require identification of the limits on the hospitals' authority to administer a course of treatment.

We interpret *Jarvis's* "course of treatment" as a reasonably specific time period during which a physician may attempt to treat a patient with a reasonably specific dosage of a particular neuroleptic medication, or an equivalent dosage of another or several other types of neuroleptic medication.

Other jurisdictions have similarly determined that courts are responsible for placing some restrictions on the administration of neuroleptic medications. In *Rivers v. Katz,* 67 N.Y.2d 485, 495 N.E.2d 337, 504 N.Y.S.2d 74 (1986), the court stated:

> If, however, the court concludes that the patient lacks the capacity to determine

the course of his own treatment, the court must determine whether the proposed treatment is narrowly tailored to give substantive effect to the patient's liberty interest.

*Id.* at 497, 495 N.E.2d at 344, 504 N.Y.S.2d at 81.

In *Guardianship of Roe,* 383 Mass. 415, 421 N.E.2d 40 (Mass.1981), the court stated in a footnote:

In his order the judge may appropriately authorize a treatment program which utilizes various specifically identified medications administered over a prolonged period of time.

*Id.* at 448 n. 19, 421 N.E.2d at 59 n. 19.

In *People v. Medina,* 705 P.2d 961 (Colo. 1985), the court stated:

If the court grants the order for involuntary medication, it may place such time limits and conditions on the administration of the medication as are appropriate under the circumstances of the case.

*Id.* at 974.

Each order must, of necessity, be tailored to the circumstances of the individual situation. Some orders will require more specificity on the authorized course of treatment, while others will require less.[2] Under the circumstances of this case, the trial court's order lacks the requisite specificity. On remand, should the evidence continue to support the hospital's petition, the court should specify the course of treatment to be authorized.

### III.

█ Steen claims he was prejudiced because he was not provided counsel and/or a guardian ad litem during the TRP proceedings. We do not believe the failure in this instance to secure representation for Steen was reversible error. Nevertheless, we caution that, in light of the particularly vulnerable position of committed patients, representation should be integrated into TRP proceedings. The Minnesota Department of Human Services Residential Facili-

ties Manual, Policy Number 6601 (Aug. 11, 1988) states:

Unit staff shall notify the patient for whom the use of neuroleptic medication is proposed of his/her right to be present and represented by a person of his/her choice, i.e., advocate, other staff member, relative, attorney, or other person at the TRP review meeting. The patient's representative * * * shall also be notified by unit staff and invited to attend the TRP review.

If the patient's representative * * * is unavailable at the time of the scheduled review, the TRP meeting can proceed without that person's presence. However, there must be an alternate person present to represent the patient. If the patient does not choose a representative, the Chief Executive Officer shall designate one.

*Id.* at § 7.C.5). "Patient's representative" is defined as a "court appointed conservator, guardian or guardian ad litem." *Id.* at § 4.J.

We also note that *Jarvis* states:

After commitment, the patient's attorney should be kept informed at all times of any proposed changes in treatment.

*Jarvis,* 418 N.W.2d at 149.

█ Finally, Steen argues that the trial court erred by failing to obtain the recommendation of a guardian ad litem before making its decision on involuntary treatment. Although *Jarvis* does indicate that a patient must be represented by a guardian ad litem during the court proceedings, the court's opinion is silent on the necessity for input by the guardian ad litem. Steen was represented during the trial court proceedings by both counsel and a guardian ad litem, who both cross-examined Dr. Van-Valkenburg. We conclude under the circumstances of this case this representation was sufficient.

### DECISION

The trial court erred by failing to appoint an examiner. The court's findings on the

---

**2.** For example, when an order authorizing neuroleptic medications is entered after an initial commitment hearing, greater flexibility will un-

doubtedly be required in the range of types and doses; however, we would anticipate less flexibility in the initial duration authorized.

authorized course of treatment are inadequate under the facts of this case.

Lack of adequate representation during the TRP proceedings is not reversible error. Representation by the guardian ad litem during the court proceedings was sufficient.

Affirmed in part and reversed and remanded in part.