**In the Matter of Lowell D. SCHAUER.**

**No. C8–89–1845.**

Court of Appeals of Minnesota.

Jan. 16, 1990.

Allan R. Poncin, Minneapolis, for appellant Schauer.

Thomas L. Johnson, Hennepin Co. Atty., Elizabeth V. Cutter, Asst. Co. Atty., Minneapolis, for respondent.

Heard, considered, and decided by WOZNIAK, C.J., FORSBERG and NORTON, JJ.

## OPINION

WOZNIAK, Chief Judge.

Lowell Schauer appeals from a judgment indefinitely continuing his commitment to the Minnesota Security Hospital as a mentally ill and dangerous person. We affirm.

## FACTS

Appellant Lowell Schauer is a 63–year–old man who killed his brother in August 1988. Schauer was found not guilty of second degree murder by reason of mental illness, and a petition was filed to commit him as mentally ill and dangerous.

On April 17, 1989, the court conducted a hearing on the commitment petition. Following the hearing, the court ordered Schauer committed to the Minnesota Security Hospital as mentally ill and dangerous. On appeal, we affirmed. *In re Schauer*, No. C8–89–1103, 1989 WL 100651 (Minn.Ct. App. Sept. 5, 1989). In our opinion, we determined that the evidence was sufficient to support the court's determination that Schauer was mentally ill and dangerous. We also affirmed the court's commitment to the Minnesota Security Hospital, although we suggested that because Schauer was a veteran, his preference to be treated at a veterans' hospital should be given serious consideration in the future, if possible.

Pursuant to the commitment order, Schauer was confined to the Minnesota Security Hospital. Initially, he was compliant with his medications and exhibited no evidence of psychosis or delusions. However, his treatment team determined that his medications should be decreased, and ultimately eliminated, to ascertain whether the drugs were therapeutic and, if so, what was the lowest dosage possible to control Schauer's psychiatric symptoms.

On June 13, 1989, Schauer requested that he be allowed to resume his medications. By that date, his speech had become confused, and he had begun to experience hallucinatory messages that his family had been killed and that he should kill others. He became loud and threatening, but after he received his medications, he improved rapidly. Schauer currently receives and willingly takes 20 milligrams of Navane, a neuroleptic medication, per day.

A 60–day review hearing was conducted on July 13, 1989. At the hearing, the court received into evidence Schauer's medical records from the Minnesota Security Hospital. The court also heard testimony by Schauer, his sister, and Douglas Fox, a licensed psychologist at the Minnesota Security Hospital. Following the hearing, the court indefinitely continued Schauer's commitment to the Minnesota Security Hospital as a mentally ill and dangerous person.

### ISSUES

1. Could the court properly continue Schauer's commitment as mentally ill and dangerous even though his symptoms were in remission when he was not deprived of his medications by hospital personnel?

2. Did the Minnesota Security Hospital violate Schauer's right to privacy by withholding his neuroleptic medications?

3. Was the Minnesota Security Hospital the least restrictive alternative available to meet Schauer's treatment needs?

### ANALYSIS

1. Minn.Stat. § 253B.02, subd. 13 defines a "mentally ill person" as:

[A]ny person who has an organic disorder of the brain or a substantial psychiatric disorder of thought, mood, perception, orientation, or memory which grossly impairs judgment, behavior, capacity to recognize reality, or to reason or understand, which

(a) is manifested by instances of grossly disturbed behavior or faulty perceptions; and

(b) poses a substantial likelihood of physical harm to self or others as demonstrated by:

\*   \*   \*   \*   \*   \*

(ii) a recent attempt or threat to physically harm self or others.

Minn.Stat. § 253B.02, subd. 13 (1988).

■ The petitioner has the burden of proving by clear and convincing evidence that the statutory requisites for commitment have been met. Minn.Stat. § 253B.18, subd. 1 (1988). On appeal, this court's review is limited to determining whether the committing court complied with the Minnesota Commitment Act and whether the court made the required findings of fact and conclusions of law. *In re Peterson*, 356 N.W.2d 746, 748 (Minn.Ct. App.1984). The court's factual findings must be affirmed if they are not clearly erroneous. *Id.*

Within 60 days after commitment as a mentally ill and dangerous person, a written treatment report must be filed with the committing court. A hearing must be held within 14 days of receipt of the treatment report or within 90 days of initial commitment, whichever is earlier. Minn.Stat. § 253B.18, subd. 2 (1988). Following this review hearing, the court may commit the person as mentally ill and dangerous for an indeterminate period of time. Minn.Stat. § 253B.18, subd. 3 (1988).

■■ Schauer argues that the court improperly continued his commitment as mentally ill and dangerous even though his symptoms were in remission when he was not on a medication holiday. The fact that a committed person's symptoms are in remission, however, is not determinative of whether the patient is dangerous:

The fact "that a patient may become symptom-free during hospitalization" does not compel a discharge from commitment.

*In re Dibley*, 400 N.W.2d 186, 192 (Minn. Ct.App.1987) (quoting *In re Malm*, 375 N.W.2d 888, 891 (Minn.Ct.App.1985)), *pet. for rev. denied* (Minn. Mar. 25, 1987).

In *In re Lufsky*, 388 N.W.2d 763, 766 (Minn.Ct.App.1986), we indicated that dangerousness may be demonstrated by past conduct, together with a determination that the patient is likely to engage in future violent conduct. Here, the court found that even though Schauer takes his medication willingly, it is not clear that he would respond as well if he were in a stressful environment. The court also found it unlikely that Schauer would voluntarily report a deterioration in his psychiatric condition. These findings are supported by the testimony of Douglas Fox and evidence which indicated that although Schauer is very medication-compliant, he often says he feels fine even when he is experiencing problems with his medications. In fact, at the time he killed his brother in 1988, Schauer was voluntarily taking non-therapeutic levels of Mellaril, but apparently failed to recognize that they were not the levels he needed.

■ 2. Schauer argues that his right to privacy was violated when the Minnesota Security Hospital placed him on a forced drug holiday. Schauer's right to privacy argument focuses on a claim that hospital personnel withheld his neuroleptic medications because they wanted to prove his symptoms would recur, evidencing a need for commitment.

In *Jarvis v. Levine*, 418 N.W.2d 139 (Minn.1988), the supreme court held that commitment to a mental health institution does not eliminate a person's right to privacy under the state constitution. *Id.* at 148. The *Jarvis* court held that when intrusive treatment with neuroleptic medications is proposed, the professional judgment of medical personnel is insufficient to protect the committed person's privacy rights; the Minnesota Constitution guarantees certain procedural protections as outlined in *Price*

*v. Sheppard. Id.* There, the court established pretreatment judicial review procedures to be applied before imposing "intrusive" forms of treatment on non-consenting patients. *Price v. Sheppard*, 307 Minn. 250, 262–63, 239 N.W.2d 905, 913 (1976).

In *In re Steen*, 437 N.W.2d 101 (Minn.Ct. App.1989), this court addressed the question of how specific a court's order must be when defining an authorized course of treatment with neuroleptic medications pursuant to *Jarvis* and *Price*. The *Steen* court stated:

> The *Price* court recognized that a trial court must balance a patient's need for treatment with neuroleptic medications against the intrusiveness of that treatment. * * * The level of intrusion of neuroleptic medications is related to the levels and dosages administered and the different types of neuroleptic medications attempted.

*Id.* at 104.

The *Price, Jarvis,* and *Steen* opinions indicate that a higher dose of neuroleptic medications, and therefore a higher "intrusiveness," is not warranted where a lower dosage is possible. As Douglas Fox explained, due to the risk of tardive dyskinesia, patients should receive the smallest dose that is still effective. At the conclusion of the hearing, the court indicated that it agreed with this explanation of why Schauer's medications were reduced. In its order, the court found that Schauer's neuroleptic medications were decreased and ultimately eliminated "to verify the therapeutic effect of the drug and to establish the lowest possible dose of the drug that would control respondent's psychiatric symptoms." This finding is supported by the record, and refutes Schauer's claim that his medications were reduced to prove his need for commitment.

■ 3. Schauer argues that the court erred by failing to find that the Minnesota Security Hospital was the least restrictive alternative available to meet his treatment needs. In our prior opinion in this matter, we recognized that Minn.Stat. § 253B.18 does not require placement at the least restrictive treatment facility for persons

initially adjudicated mentally ill and dangerous. However, when a person is committed indefinitely as mentally ill and dangerous, placement at the least restrictive alternative placement facility is required:

> The burden of proof at the hearing is upon the proponent of indeterminate commitment to establish by clear and convincing evidence that:
>
> \* \* \* \* \* \*
>
> (b) There is no appropriate less restrictive alternative available.

Minn.R.Civ. Commitment 12.06.

 Douglas Fox testified that Schauer's treatment team had recommended commitment to the Minnesota Security Hospital. He indicated that the Minnesota Security Hospital was the least restrictive alternative that would meet Schauer's treatment needs and protect society. Fox stated that the veterans' hospital would be inappropriate because of the security risks that Schauer presents. He specifically indicated that placement at the security hospital would be better than the veterans' hospital due to closer supervision and tighter security.

This evidence supports the court's determination that commitment to the Minnesota Security Hospital was necessary. Although the court did not specifically find that the security hospital was the least restrictive alternative, the court's other findings support and compel such determination.

Finally, we are constrained to comment on the following statement by the court at the conclusion of the hearing:

> [T]he veterans administration facilities \* \* \* are not secure. The medical director of that facility has informed this Court that he's under no duty, obligation or responsibility whatsoever to provide information to this Court or to Hennepin County social workers about their patients' needs and abilities and recovery. They are not willing to participate in after-care planning. They are not willing to provide security. Indeed, they don't regard themselves as obliged to follow state law at all.

Unless government regulations prevent closer cooperation, we are disappointed in the attitude of the VA or the federal medical director. Medical treatment is an important and critical obligation our government owes for the sacrifices of its veterans, and cooperation between federal and state authorities should be encouraged.

## DECISION

The trial court did not err by indefinitely continuing Schauer's commitment to the Minnesota Security Hospital.

Affirmed.