**In the Matter of Richard E. MARTIN.**

No. C9–94–2291.

Court of Appeals of Minnesota.

Feb. 7, 1995.

Donald R. Betzold, Brooklyn Center, for appellant Martin.

Hubert H. Humphrey, III, Atty. Gen., William H. Mondale, Asst. Atty. Gen., St. Paul, for respondent.

Considered and decided by PARKER, P.J., NORTON, and SCHUMACHER, JJ.

## OPINION

PARKER, Judge.

Appellant Richard Martin was committed as mentally ill and dangerous. The medical director of the Minnesota Security Hospital sought authorization to treat appellant with neuroleptic medication. After a hearing, the trial court authorized the treatment. Martin appeals, and we affirm.

## FACTS

Richard Martin has suffered from mental illness since at least 1971 and has been hospitalized many times. *See Martin v. Gomez*, No. C1–93–2436 1994 WL 164200 (Minn.App. May 3, 1994), *pet. for rev. denied* (Minn. June 15, 1994). In 1981, he was committed to the Minnesota Security Hospital as mentally ill and dangerous after attacking a judge and several deputies.

Martin was later transferred to less restrictive facilities. In 1990, while at an open hospital, he absconded and traveled to St. Paul. There, he attacked the director of a Planned Parenthood clinic, based on his belief that he was on a "mission of mercy" and that the director was a "serial killer." Martin was returned to the security hospital. In June 1993, he petitioned for transfer to an open hospital. This court upheld the denial of the petition. *Id.*

Martin suffers from schizophrenia. He has been treated with various neuroleptics. Medical records indicated that use of Clozaril was most effective. The level of his delusions was reduced, and he became less irritable and threatening. He was able to work, live in a less restrictive unit, and participate in programs.

Martin complained that Clozaril made him tired and indicated he wished to try the new neuroleptic drug Risperdal in the hope it would not so affect him. After some initially promising results, his condition deteriorated. He "showed increasingly manic and deteriorating behavior" and was "very religiously delusional and in very poor control." He was given Haldol intramuscularly and placed in seclusion.

Martin then asked that he be treated with Prolixin, which he had received previously. Because he had experienced observable side effects including early signs of tardive dyskinesia, he could not be given Prolixin; he was instead treated with Haldol and intermittently with Clozaril. During this period, his condition again deteriorated to the point that in late May he assaulted another patient whom he accused of being the devil. He was then transferred from the low-security unit to the high-security unit. Staff attempted to reinstate treatment with Clozaril.

Dr. Frank Rundle requested approval from the treatment review panel to treat Martin with up to 900 milligrams of Clozaril per day, or up to 100 milligrams of Haldol per day. The panel approved Dr. Rundle's request. Dr. William Erickson, the security hospital medical director, petitioned for court authorization to treat Martin with up to 900 milligrams of Clozaril per day, orally or by nasogastric tube if necessary, or 100 milligrams of Haldol per day.

At the hearing, Dr. Henry Lutzwick, a senior staff psychiatrist at the security hospital, testified that Martin is presently taking 350 milligrams of Clozaril per day pursuant to a court order. He responded favorably to Clozaril and has not suffered significant side effects, although he has experienced constipation and sedation. While he still experiences delusions, he is far more cooperative and is not assaultive. He is far less obsessed with delusional content, he can participate in other programs, he can work, and he is eligible to return to a less restrictive unit.

In contrast, when Martin received Haldol or Prolixin, he was extremely psychotic, was more focused on his thoughts and obsessions, and assaulted without provocation. He also showed signs of possible tardive dyskinesia.

The security hospital petitioned for permission to administer Clozaril by nasogastric tube because, unlike typical neuroleptics, Clozaril cannot be introduced by intramuscular injection if the patient refuses the medication. If Martin refused to take Clozaril orally, a physician would place a nasogastric tube through his nose into his stomach to administer neuroleptics. Restraints and an anesthetic jelly would be used, but the proce-

dure is uncomfortable. While Dr. Lutzwick described this as a much less desirable method than oral administration, it would be used if he refused the medication.

Dr. Thomas Lee Folsom, the court-appointed examiner, testified that Martin does not believe he is mentally ill or in need of medication. He is not competent to make decisions about medication or treatment. Dr. Folsom also concluded that Martin exhibited a number of indicators for use of Clozaril. He cited the failure of multiple trials with conventional neuroleptics, failure of Risperdal, and a superior symptomatic response with Clozaril even though his delusional symptoms remained fixed. The presence of tardive dyskinesia is also an indicator of a switch to Clozaril. Folsom recommended, however, that, rather than forcing Clozaril by nasogastric tube, the staff should discuss Martin's concerns with him, including his fear that he would suffer seizures from taking the medication.

On October 11, 1994, the court filed an order authorizing the security hospital to treat Martin with up to 900 milligrams of Clozaril by mouth, or by nasogastric tube if necessary. The court also authorized use of up to 100 milligrams of Haldol per day.

Martin appeals, challenging only the portion of the order authorizing the Clozaril and use of a nasogastric tube.

## ISSUE

Was the trial court's order authorizing treatment with Clozaril, by nasogastric tube if necessary, supported by the record?

## DISCUSSION

■ The trial court must balance the need for treatment against its intrusiveness. *See Jarvis v. Levine*, 418 N.W.2d 139, 144 (Minn.1988). The facility seeking to administer neuroleptics must prove by clear and convincing evidence that such medication is necessary. *In re Peterson*, 446 N.W.2d 669, 672 (Minn.App.1989), *pet. for rev. denied* (Minn. Dec. 1, 1989). On appeal, the trial court's findings must be affirmed unless they are clearly erroneous. *In re Schauer*, 450

N.W.2d 194, 196 (Minn.App.1990); Minn. R.Civ.P. 52.01.

■ One relevant factor that Martin challenges is "the extent and duration of changes in behavior patterns and mental activity effected by the treatment." *Jarvis*, 418 N.W.2d at 144. Martin argues that the trial court did not have clear and convincing evidence that treatment with Clozaril is effective. He cites the fact that he continued to experience delusions and was unable to obtain a transfer to an open hospital even while taking Clozaril. Martin poses substantive arguments to the evidence presented by the security hospital. We cannot, however, consider the matter *de novo*, but may reverse the findings only if clearly erroneous. *See Schauer*, 450 N.W.2d at 196. Martin cites no errors of law by the trial court.

The court found the caregivers were of the unanimous opinion that Clozaril is a better medication for Martin because it greatly reduces his symptoms of mental illness and makes him more amenable to other treatment while avoiding the risk of tardive dyskinesia. While it did not remove his delusions, it reduced the effect the delusions had on his behavior.

The evidence showed that Clozaril allowed him to transfer to an open unit and work, decreased his fixation on his delusions, and lessened his hostility and aggression. Both experts who testified recommended treatment with Clozaril. Further, when he was given the typical neuroleptics, his assaultive behavior, fixed delusions, and psychosis increased. The trial court was presented clear and convincing evidence from which to find that the Clozaril affected his behavior patterns and mental activity positively. *See Peterson*, 446 N.W.2d at 672.

■ Another factor which must be balanced is the extent of intrusion into the patient's body and the pain connected with the treatment. *See Jarvis*, 418 N.W.2d at 144. Martin also challenges the trial court's authorization of use of a nasogastric tube, if necessary, to administer Clozaril if he refuses to take it by mouth.

Martin argues that the use of a nasogastric tube is not medically necessary. *See In re*

*Kinzer*, 375 N.W.2d 526, 532 (Minn.App.1985) (treatment must be presently necessary). He cites Dr. Folsom's opinion that the treatment team should first listen to his concerns about side effects. He contends that the use of Haldol is another alternative. He cites the fact that neither Dr. Lutzwick nor Dr. Folsom could cite any other instances in which a committed patient was given neuroleptic medication by nasogastric tube.

Both experts testified that Clozaril was necessary to treat Martin's illness and that other neuroleptics, including Haldol, were not effective. If he refuses to take Clozaril voluntarily, the only alternative means of administration is by nasogastric tube. By electing to take the medication orally, Martin can avoid the discomfort associated with the intubation procedure. If the medication is medically necessary, the means to administer it must be medically necessary as well. The trial court's weighing of the extent of the intrusion of the tube, and authorization of the procedure, were not clearly erroneous.

 Finally, Martin argues that the trial court should not have authorized the use of a nasogastric tube, because the physician treatment review panel request and the treatment panel report did not explicitly refer to this method of administration. The treatment review panel procedure is important. *Jarvis*, 418 N.W.2d at 149 (if treatment review panel and hospital review board approve physician's proposal for medication, court approval should be forthcoming; otherwise, serious questions as to reasonableness and necessity of plan arise); *Peterson*, 446 N.W.2d at 672 (recognizing importance of review panel and recommending representation when its opinion conflicts with opinion of treating physician). However, a court may override a treatment review panel's disapproval of a request to treat an incompetent, consenting patient. *See In re Schmidt*, 443 N.W.2d 824, 828 (Minn.1989); Minn.Stat. § 253B.03, subd. 6c(d). Even though the treatment review panel did not consider the use of a nasogastric tube, there is no requirement in the law that it do so, and the trial court had authority to consider and approve this method of administration. In light of the extensive testimony at the hearing on the

issue, the failure of the treatment review panel request or report to mention the nasogastric tube specifically, does not preclude court approval.

The medical experts presented informed medical opinions and provided a factual basis for their recommendations. The trial court received clear and convincing evidence from which to conclude that the use of Clozaril, by nasogastric tube if necessary, was both reasonable and necessary.

## DECISION

The order of the trial court authorizing the involuntary administration of Clozaril and allowing the use of a nasograstric tube, if necessary, is affirmed.

**Affirmed.**