**In the Matter of Donald Warren PETERSON.**

No. C2–89–1212.

Court of Appeals of Minnesota.

Oct. 17, 1989.

Review Denied Dec. 1, 1989.

---

**1.** Classification in Mental Retardation 32–34, 183 (H. Grossman ed.1983).

Donald R. Betzold, Brooklyn Center, for appellant Peterson.

Hubert H. Humphrey, III, Atty. Gen., Kathy Meade Hebert, Ronald S. Latz, Sp. Asst. Attys. Gen., St. Paul, for respondent.

R. Thomas Greene, Minneapolis, guardian ad litem.

Heard, considered and decided by WOZNIAK, C.J., HUSPENI and RANDALL, JJ.

## OPINION

RANDALL, Judge.

Donald Warren Peterson, previously committed as mentally ill and dangerous, appeals from an order authorizing the Minnesota Security Hospital to treat him with neuroleptic medications. We affirm.

## FACTS

Donald Peterson shot and killed his roommate in December 1985. As part of the evidence regarding his competency to stand trial, it came out that Peterson claimed the act of killing his roommate was required to prove his readiness as a special government agent. After a hearing, Peterson was determined incompetent to stand trial on the criminal charges, and was indefinitely committed as mentally ill and dangerous to the Minnesota Security Hospital. Peterson appealed, and we affirmed the commitment. *In re Peterson*, 396 N.W.2d 858 (Minn.Ct.App.1986).

At the initial commitment hearing, the court-appointed examiner testified that Peterson's diagnosis was paranoid schizophrenia or a paranoid disorder. At Peterson's 60–day review hearing, psychologist Douglas Fox characterized his working diagnosis as paranoid disorder. Peterson's working diagnosis at the Minnesota Security Hospital remained paranoid disorder until December 1988, although one physician believed Peterson's disorder was a result of schizophrenia.

In December 1988, Dr. Charles VanValkenburg, Peterson's treating physician,

changed his diagnosis to paranoid schizophrenia, and sought authority from a hospital Treatment Review Panel (TRP) to treat Peterson involuntarily with neuroleptic medications. The TRP denied Dr. VanValkenburg's request. Although the panel's report noted that past treatment with psychotherapy had been ineffective, and that other treatment alternatives would be more intrusive than neuroleptics, the TRP concluded there was insufficient documentation to support a change in diagnosis.

The medical director of the Minnesota Security Hospital sought court approval to override the TRP's decision and administer medication to Peterson. The district court conducted a *Jarvis* hearing on the medical director's request, pursuant to the requirements of *Jarvis v. Levine,* 418 N.W.2d 139 (Minn.1988).

Dr. VanValkenburg testified that it was difficult to say whether neuroleptics would work if Peterson were indeed suffering from a paranoid disorder. He admitted there was some question about his change in diagnosis; however, he was willing to testify to a reasonable medical certainty that his new diagnosis of paranoid schizophrenia was correct. Dr. VanValkenburg indicated that he wanted to treat Peterson's symptoms, rather than a label.

Dr. VanValkenburg stated that although the likelihood of full recovery with neuroleptics was minimal, past attempts at psychotherapy had been inadequate, and alternative methods of treatment, such as electro-convulsive therapy, would be more intrusive than neuroleptic medications. Dr. VanValkenburg indicated that if Peterson were not treated with neuroleptics, he would remain untreated and "warehoused" indefinitely. Peterson's guardian ad litem agreed that it was in Peterson's best interests to attempt treatment with neuroleptic medications.

Dr. VanValkenburg believed Peterson was not competent to refuse treatment with neuroleptic medications because he was incapable of weighing the benefits and risks of the medications and did not believe he was mentally ill.

Following the hearing, the court issued an order authorizing the Minnesota Security Hospital to treat Peterson with neuroleptic medications. The court concluded that Peterson was not competent to refuse his consent, and that the benefits to Peterson outweighed the risks from treatment with neuroleptic medications.

## ISSUES

1. Did the committing court have the authority to override the Treatment Review Panel's decision regarding treatment with neuroleptic medications?

2. Does the record support the court's order authorizing treatment with neuroleptic medications?

3. Does the record support the court's determination that Peterson was incompetent to refuse treatment with neuroleptic medications?

## ANALYSIS

### I.

*Final Authority*

In *Jarvis v. Levine,* 418 N.W.2d 139 (Minn.1988), the supreme court held that medical authorities seeking to treat a patient involuntarily with neuroleptic medications must first obtain court approval. Peterson argues that *Jarvis* hearings should be limited to instances where all the medical professionals involved (treating physicians and the TRP) agree that a patient needs medication, but the patient refuses. Peterson claims the *Jarvis* decision did not intend that a court may override the decision of a TRP when the TRP refuses authorization to medicate over the recommendation of the physician.

However, in *Jarvis,* as in the present case, the treating physician and medical director were in favor of administering neuroleptic medications, but the TRP refused to authorize them. The *Jarvis* decision held that court approval is necessary under these circumstances. *Id.* at 149.

In response to *Jarvis,* the legislature enacted Minn.Stat. § 253B.03, subd. 6a (1988), limiting the circumstances in which neuro-

leptic medications may be administered. *In re Schmidt*, 443 N.W.2d 824, 825 (Minn. 1989) addressed the question whether the new statute deprives a patient of any due process or privacy rights. In rendering its decision, the *Schmidt* court indicated that implicit in the statute is the requirement of a court hearing where the patient has failed to manifest refusal but the guardian ad litem or medical review panel refuses to approve the administration of neuroleptics. *Id.* at 828.

In light of the language in *Jarvis* and *Schmidt*, we conclude a district court, after a full and proper hearing, may override the decision of a Treatment Review Panel upon a showing of the necessity for treatment with neuroleptic medications.

## II.

*Sufficiency of the Evidence*

Peterson claims the trial court erred by finding he has been suffering from paranoid schizophrenia, rather than a paranoid disorder. We have previously indicated that the focus of a *Jarvis* hearing is upon treatment, not diagnosis. *In re Jarvis*, 433 N.W.2d 120, 124 (Minn.Ct.App.1988).

Peterson argues that, given the uncertainty in his diagnosis, the court could not find by clear and convincing evidence that the administration of neuroleptic medications was warranted. In other provisions of the Minnesota Commitment Act the legislature has stated the petitioner's burden of proof is clear and convincing evidence. *See e.g.*, Minn.Stat. § 253B.09, subd. 1 (1988) (court must find by clear and convincing evidence that proposed patient is mentally ill, mentally retarded, or chemically dependent); Minn.Stat. § 253B.18, subd. 1 (1988) (proposed patient must be proven mentally ill and dangerous to the public by clear and convincing evidence).

In enacting Minn.Stat. § 253B.03, subd. 6a, the legislature required court approval to administer neuroleptic medications in certain instances, but did not indicate whether the burden of proof should be clear and convincing evidence or another standard.

■ When interpreting a statutory provision, the court may look to other related provisions to determine the legislature's intent. *See Anderson v. Commissioner of Taxation*, 253 Minn. 528, 533, 93 N.W.2d 523, 528 (1958). We conclude the legislature intended that persons seeking to administer neuroleptic medications must prove by *clear and convincing evidence* that such medication is necessary. This interpretation finds support in the *Jarvis* decision, which recognizes the gravity of such intrusive treatment and the necessity for extensive safeguards.

■ The *Jarvis* court cited the following criteria to be considered in determining the necessity for and reasonableness of treatment with neuroleptic medications:

(1) the extent and duration of changes in behavior patterns and mental activity affected by the treatment, (2) the risks of adverse side effects, (3) the experimental nature of the treatment, (4) its acceptance by the medical community of this state, (5) the extent of intrusion into the patient's body and the pain connected with the treatment, and (6) the patient's ability to competently determine for himself whether the treatment is desirable.

*Jarvis*, 418 N.W.2d at 144, *quoting Price v. Sheppard*, 307 Minn. 250, 262–63, 239 N.W.2d 905, 913 (1976). The trial court properly applied these criteria to Peterson's situation in determining the proposed treatment should be allowed. Dr. VanValkenburg presented extensive testimony supporting his belief that treatment with neuroleptic medications should be attempted in the patient's best interests. Based upon Dr. VanValkenburg's testimony, the court could find clear and convincing evidence that such treatment was appropriate and that the benefits of such treatment outweighed the risks connected therewith.

We note that the views of the Treatment Review Panel were represented solely by a one page summary of its decision entered into the record. We believe that in the future, when the attending physician and Treatment Review Panel have conflicting views, the interests of the patient and the administration of justice would be better

served by representation of the Treatment Review Panel at the *Jarvis* hearing, either by counsel or in the form of a detailed written report to be submitted into the record and considered by the reviewing courts. Obviously, the opinion of the TRP is of great importance in these matters and deserves representation at both the court hearing and appellate level.

### III.

*Competency to Decide*

■ In *Jarvis*, the Minnesota Supreme Court determined that "a finding of legal incompetence is a prerequisite to involuntary medication with neuroleptics." *Jarvis*, 418 N.W.2d at 148 n. 7. Likewise, Minn.Stat. § 253B.03, subd. 6a provides that a court may approve the administration of neuroleptic medications to a patient who is "not competent" to consent.

Neither the *Jarvis* decision nor the legislature defined "incompetence" for purposes of proceedings relating to the administration of neuroleptic medications. The *Jarvis* court, however, cited Beck, *Right To Refuse Anti–Psychotic Medication: Psychiatric Assessment and Legal Decision–Making,* 11 Mental and Physical Disability Law Rptr. 368 (1987). The Beck article states:

> Patients who deny that they have a mental disorder in the face of good evidence to the contrary lack the capacity to decide rationally about medication. A person who thinks he is not ill has no reason to take medication. A person who incorrectly thinks he is not ill cannot have a rational understanding of the consequences of taking or not taking medication. Therefore, such a person is incompetent.

*Id.* at 369–370. Beck also provides a clinical definition of competency to refuse neuroleptic medications, involving the following three elements: (1) an awareness of having a mental disorder; (2) sufficient knowledge about medication and the mental disorder; and (3) a refusal that is not based upon delusional beliefs. *Id.* at 369. We find that under the Beck analysis the record supports the trial court's finding that Peterson was not legally competent to make the important decision whether to accept or refuse neuroleptic medication. First of all, Peterson consistently denied any mental illness in himself. Under the *Beck* analysis, a patient's flat out denial "in the face of good evidence to the contrary" can be used as a symptom that the patient is not in touch with reality. Peterson qualifies under this first criteria, as the evidence overwhelmingly supports the existence of a real and substantial mental disorder. The only slight disagreement among the medical professionals is whether it is a paranoid disorder or paranoid schizophrenia. Also, as noted, Peterson was previously properly committed as mentally ill and dangerous. Although the criteria for commitment are different from the criteria for whether one is competent to decide the question of neuroleptic medication for oneself, the official record of Peterson's commitment does bear on the question of whether he is mentally ill in assessing the reasonableness of his insistence that he is not.

The second Beck criterion is close. Peterson displayed a basic knowledge about the proposed medication. The third Beck criterion was partially met as the trial court properly found that Peterson's refusal was partly based on the delusional belief that he is not mentally ill. The Beck criteria require a finding of all three in favor of the patient for competency to be found. Those advocating the use of involuntary neuroleptics need not disprove all three in order to prevail.

Involuntary medication of mentally ill people presents an issue of the highest concern in a civilized society. In recognition, the Minnesota courts and the legislature have surrounded this personal intrusion into one's liberty with a series of safeguards culminating in strict judicial review. The record discloses that Peterson's rights were protected. The trial court did not abuse its discretion in accepting the medical evidence from the professionals recommending involuntary medication, even though the TRP maintained a contrary position. The law was followed properly and

the views of the competing interests were given fair consideration.

### DECISION

The court properly authorized treatment of Peterson with neuroleptic medications.

Affirmed.