STATE OF MINNESOTA

IN SUPREME COURT

A24-0067

Court of Appeals                                         Hennesy, J.
                              Dissenting, Procaccini, Thissen, Gaïtas, JJ.

In the Matter of the Civil Commitment
of: Leah Christina Graeber                        Filed: March 11, 2026
                                               Office of Appellate Courts

———————————————

Jennifer L. Thon, Jones Law Office, Mankato, Minnesota, for appellant Leah Christina
Graeber.

Kathryn M. Keena, Dakota County Attorney, Todd P. Zettler, Assistant Dakota County
Attorney, Hastings, Minnesota, for respondent Dakota County Social Services.

Keith Ellison, Attorney General, Emily B. Anderson, Morgan Alexander, Assistant
Attorneys General, Saint Paul, Minnesota, for amicus curiae Minnesota Department of
Human Services.

———————————————

S Y L L A B U S

The balancing test established in *Price v. Sheppard*, 239 N.W.2d 905 (Minn. 1976),

and affirmed in *Jarvis v. Levine*, 418 N.W.2d 139 (Minn. 1988), which requires a district

court to find that an intrusive treatment is both necessary and reasonable before it can be

administered to a civilly committed patient, adequately addresses whether the intrusive

treatment is a "treatment necessary to preserve the life or health of any committed patient"

under Minn. Stat. § 253B.03, subd. 6(b).

Affirmed.

1

HENNESY, Justice.

This case requires us to decide whether the legal test that Minnesota courts apply when ruling on petitions to administer involuntary intrusive treatments such as electroconvulsive therapy (ECT) to civilly committed individuals—the framework we established in *Price v. Sheppard*, 239 N.W.2d 905 (Minn. 1976), and affirmed in *Jarvis v. Levine*, 418 N.W.2d 139 (Minn. 1988)—adequately addresses the statutory language setting forth a means for obtaining consent to any "treatment necessary to preserve the life or health of any committed patient" in Minn. Stat. § 253B.03, subd. 6(b). Since 1988, district courts have decided such petitions using the *Price*/*Jarvis* balancing test, which requires courts to determine if the intrusive treatment is both "necessary and reasonable." *Price*, 239 N.W.2d at 910. Under this analysis, district courts "balance the patient's need for treatment against the intrusiveness of the prescribed treatment" in light of six factors we outlined in *Price*. *Id.* at 913.

Generally, under Minn. Stat. § 253B.03, subd. 6(a), civilly committed individuals have the right to consent to medical and surgical treatments, including intrusive mental health treatments such as ECT. The statute—which was enacted after we decided *Price*—sets forth the procedures to obtain consent "for any treatment necessary to preserve the life or health of any committed patient[.]" *Id.*, subd. 6(b). In such circumstances, if a committed individual is unable or refuses to consent and consent cannot be obtained from an authorized representative or "nearest proper relative," the statute authorizes the head of a treatment facility or state-operated treatment program, or an interested person, to petition

2

the district court for authorization to administer intrusive treatments for mental illness. *See id.*, subd. 6(b)(3).

In this case, appellant Leah Graeber, who is civilly committed, appealed a district court order authorizing involuntary ECT administration pursuant to this statute after applying the *Price/Jarvis* balancing test. In the court of appeals, she argued that the district court erred when it only applied the *Price*/*Jarvis* balancing test and did not separately address the statutory language—"treatment necessary to preserve the life or health"—in Minn. Stat. § 253B.03, subd. 6(b). Graeber asserted this language imposes an additional requirement district courts must address before authorizing treatment. The court of appeals rejected this argument and concluded the *Price*/*Jarvis* balancing test "subsume[s] the medical-necessity element that appellant wishes to have this court analyze separately," observing that the court of appeals' role is "limited to identifying errors and correcting them." *In re Graeber*, No. A24-0067, 2024 WL 2890845, at *4 (Minn. App. June 10, 2024). After further determining that the district court properly considered and balanced the *Price/Jarvis* factors, the court of appeals affirmed the ECT authorization. *Id*. at *4–7. Graeber petitioned this court, arguing that the *Price* factors do not adequately consider the statutory language, and we granted review.

The question before us is thus whether the *Price*/*Jarvis* balancing test adequately addresses the language in Minn. Stat. § 253B.03, subd. 6(b), specifying that, when a treatment facility petitions a court to approve treatment, the treatment must be "necessary to preserve the life or health of any committed patient." Minn. Stat. § 253B.03, subd. 6(b).

Because we conclude the balancing test we articulated in *Price/Jarvis* adequately addresses this statutory language, we affirm the court of appeals.

## FACTS

Appellant Leah Graeber has been civilly committed on several occasions, beginning in 2001. Her current civil commitment was initiated in 2011 after she was found incompetent to proceed in a criminal vehicular homicide case. In that case, Graeber was accused of losing control of her vehicle while driving at a high speed and crashing into an oncoming vehicle, killing an 11-year-old boy and seriously injuring his family. During a competency evaluation, Graeber claimed the boy was not dead and declared herself God. Graeber was diagnosed with schizoaffective disorder, bipolar type, with symptoms of psychosis and grandiose delusion, as well as multiple controlled-substance disorders. A district court committed her as a person who is mentally ill and dangerous pursuant to Minn. Stat. § 253B.18, and her civil commitment became indeterminate in 2012.[1] Graeber has since resided at the state's secure hospital in St. Peter.

---

[1] Under Minn. Stat. § 253B.18, "[i]f the court finds at the final determination hearing held pursuant to subdivision 2 that the patient continues to be a person who has a mental illness and is dangerous to the public, then the court shall order commitment of the proposed patient for an indeterminate period of time." Graeber's indeterminate commitment as a mentally ill and dangerous person was affirmed on appeal. *In re Graeber*, No. A12-0710, 2012 WL 4052899 (Minn. App. Sep. 17, 2012). In 2014, Graeber unsuccessfully petitioned for provisional or full discharge from her civil commitment. The court of appeals upheld the district court's denial. *In re Graeber*, No. A17-0259, 2017 WL 3013344 (Minn. App. July 17, 2017). In 2015, Graeber appealed a district court order authorizing the administration of neuroleptic medications. *In re Graeber*, No. A15-1139, 2016 WL 208440 (Minn. App. Jan. 19, 2016). The court of appeals affirmed the district court's order. *Id*. at *1.

In 2023, a psychiatrist at the hospital petitioned the district court for authorization to administer ECT to Graeber.[2]  In the petition, the psychiatrist described Graeber's persistent symptoms of psychosis which led him to conclude that ECT was necessary, including "grandiosity[,] believing she is 'God,' paranoid and delusional thoughts about peers and staff, elevated mood with agitation, pressured speech, lack of insight, and verbal aggression at times."  The psychiatrist explained that ECT is "the least restrictive treatment for this patient at this time," because "[a]fter exhausting the different psychotropic medication treatment modalities in addition to therapy," Graeber's "refractory symptoms are preventing her from moving forward in treatment to a less restrictive setting."  The psychiatrist concluded that he could not obtain Graeber's consent to ECT because Graeber "lacks capacity to make a rational decision regarding the proposed treatment."  Because Graeber could not consent, the psychiatrist petitioned the district court for authorization to administer ECT pursuant to Minn. Stat. § 253B.03, subd. 6(b)(3) (authorizing the head of a treatment facility or state-operated treatment program, or an interested person, to petition

---

[2]    ECT is a mental health treatment that sends electric currents through a patient's brain, intentionally triggering a seizure.  *See* Zhi-De Deng et al., *How Electroconvulsive Therapy Works in the Treatment of Depression: Is it the Seizure, the Electricity, or Both?*, 49 Neuropsychopharmacology Reviews 150, 151 (2024), https://www.nature.com/articles/s41386-023-01677-2 [https://doi.org/10.1038/s41386-023-01677-2].  It is used to treat individuals with severe mental health conditions—such as schizophrenia, psychosis, catatonia, bipolar disorder, and major depression—who are resistant to other forms of treatment. *Id.*  The district court's findings included that "ECT is not experimental and has been utilized for many years to treat mental health disorders," "ECT is accepted in the general psychiatric community in Minnesota and most other states," "ECT involves minimal pain connected with the treatment, which primarily is due to the insertion of an intravenous line into the arm," and "[p]atients are under general anesthesia while the ECT is given minimizing the amount of pain from the treatment."

the committing court to approve "any treatment necessary to preserve the life or health of any committed patient" when the patient, or patient's relative or authorized representative, is unable to consent).

In making its decision on the petition to authorize ECT, the district court appointed two examiners to evaluate Graeber. The first examiner concluded that, under *Price*, ECT was reasonable and necessary to alleviate Graeber's delusional thoughts and thought disorganization. The second examiner opined that ECT could "be expected to result in a stabilization of mood as well as a potential decrease in psychotic symptoms" and concluded that ECT was "medically necessary" under *Price*.[3] The second examiner concluded that Graeber's reasons for rejecting ECT were "based on delusion." When the examiner attempted to determine whether Graeber would "prefer to stay in the hospital indefinitely" rather than receive ECT, Graeber responded that she would not need to stay in the facility much longer, with or without ECT, because "[p]eople will come to recognize that she is God," and that "the incompetent and stupid people who head the mental health system will be replaced."

---

[3] The second examiner qualified her conclusions by acknowledging the difficulties of this case. She noted that "[p]hysicians, this examiner included, frequently reference 'medical necessity,' as if there is a definitive meaning. There is not a bright line." While the examiner acknowledged that Graeber was not "at imminent risk to herself or others, or at imminent risk of severe morbidity or mortality if ECT is not authorized at this time," she nevertheless concluded that ECT was necessary because it is "virtually the only option available that can be hoped to provide at least a moderate degree of improvement" or "the potential ability to move forward in treatment."

After considering the examiners' findings and testimony at a hearing,[4] the district court issued an order authorizing ECT. The court found that Graeber's "symptoms have persisted despite robust doses of neuroleptic medication" and that she "remains actively psychotic, persistently delusional, and in extreme denial." The court concluded that "[w]ithout ECT [Graeber]'s condition will likely remain the same and maybe even deteriorate. There are no viable treatment alternatives other than ECT . . . ." The district court applied the *Price/Jarvis* balancing test and made findings under each of its six factors.[5] The court found "clear and convincing evidence that the treatment of [Graeber]'s mental illness using ECT is necessary and reasonable." The court authorized administering Graeber a specified number and duration of ECT treatments.

Graeber appealed, arguing that the district court's order was erroneous because it did not separately analyze whether ECT treatment was "necessary to preserve [her] life or health" under Minn. Stat. § 253B.03, subd. 6.[6] *Graeber*, 2024 WL 2890845, at *4.

---

[4] Of the two examiners who evaluated Graeber, only the second testified at the hearing. An expert who had observed the first examiner conduct Graeber's evaluation also testified.

[5] The six factors identified in the *Price/Jarvis* balancing test are "(1) the extent and duration of changes in behavior patterns and mental activity effected by the treatment, (2) the risks of adverse side effects, (3) the experimental nature of the treatment, (4) its acceptance by the medical community of this state, (5) the extent of intrusion into the patient's body and the pain connected with the treatment, and (6) the patient's ability to competently determine for himself whether the treatment is desirable." *Price*, 239 N.W.2d at 913; *Jarvis*, 418 N.W.2d at 144.

[6] Before the court of appeals, Graeber also argued that the district court's order did not comply with a court of appeals decision that requires district courts to consider the "present" need for intrusive mental health treatment, not a possible future need for

Graeber asserted that "necessary" within the statute means "absolutely needed or required," and by that definition, ECT is not medically necessary for her. *Id.*

Reasoning that Graeber's argument overlooked the framework for determining whether a treatment is both necessary and reasonable established in *Price*, the court of appeals rejected her argument and affirmed the district court's order authorizing ECT. *Id.* at *7. The court concluded that the *Price*/*Jarvis* balancing test "subsume[s] the medical-necessity element that appellant wishes to have this court analyze separately." *Id.* at *4. The court of appeals then reviewed the district court's order and concluded that the district court's findings under each of the six *Price* factors were supported by clear and convincing evidence. *Id.* at *5–7. As such, the court concluded that the record supported the district court's ultimate finding that ECT was necessary and reasonable. *Id.* at *6–7. We granted Graeber's petition for review.[7]

---

treatment. *In re Kinzer*, 375 N.W.2d 526, 532 (Minn. App. 1985). The court of appeals concluded that the *Price*/*Jarvis* balancing factors "inherently address the question that [Graeber] wants separately analyzed: Is the treatment medically necessary?" *Graeber*, 2024 WL 2890845, at *4. Although Graeber repeats this argument on appeal to this court, we decline to address it for the reasons set forth in footnote 7 of this opinion.

[7] Graeber asks us to "clarify and harmonize" three authorities: Minn. Stat. § 253B.03, subd. 6(b); our decision in *Price*, 239 N.W.2d 905; and the court of appeals' decision in *Kinzer*, 375 N.W.2d 526. *Kinzer* is not binding on this court. *Hook & Ladder Apartments, L.P. v. Nalewaja*, 25 N.W.3d 867, 871 (Minn. 2025) (stating that "we are not bound to follow court of appeals precedent"). And despite Graeber's characterization of *Kinzer* as an extension of *Price*, *Kinzer* merely interpreted *Price*, concluding that *Price* requires a "present" need for treatment rather than a medical professional's determination that treatment may be required in the future. *Kinzer*, 375 N.W.2d at 532. We see no need to harmonize *Kinzer* with *Price* and instead focus on Graeber's argument based on Minn. Stat. § 253B.03, subd. 6(b).

8

## ANALYSIS

The sole issue before us is whether our *Price*/*Jarvis* balancing test—the test district courts currently apply when deciding petitions to administer intrusive forms of treatment such as ECT to civilly committed individuals without their consent—adequately addresses the statutory language in Minn. Stat. § 253B.03, subd. 6(b), specifying that a treatment facility may bring such a petition for "treatment necessary to preserve the life or health of any committed patient."[8]  In order to make this determination, we first review our decisions in *Price* and *Jarvis*.  Then, we interpret the statutory language at issue—"treatment necessary to preserve the life or health of any committed patient"—before deciding whether our *Price/Jarvis* balancing test adequately addresses the statutory phrase.

### A.

We first recognized an individual's constitutional right to privacy against intrusive medical treatment in our landmark decision in *Price*.  Price, a minor, was civilly committed in 1971 and admitted to a secure hospital due to mental illness and substance abuse.  *Price*, 239 N.W.2d at 907.  After his commitment, doctors diagnosed him with schizophrenia.  *Id*. at 908.  Price failed to respond to medication and remained aggressive and assaultive to

---

[8]    Graeber did not seek review of the court of appeals' conclusion that the district court's consideration of the *Price* factors is supported by clear and convincing evidence and that the district court properly balanced the *Price* factors.  *Id.* at *4–7.  We do not address those determinations, following our general practice of "not address[ing] issues that were not raised in a petition for review."  *See In re GlaxoSmithKline PLC*, 699 N.W.2d 749, 757 (Minn. 2005).

staff and other patients. *Id*. The hospital's medical director prescribed ECT,[9] and sought Price's mother's consent for this treatment. *Id*. Price's mother arranged for an examiner to conduct an independent medical examination. *Id*. The examiner recommended continuing treatment with medication, but, if Price's condition did not improve, then administering ECT. *Id*. The hospital staff followed this recommendation. *Id*. When Price did not improve, the hospital administered ECT over the course of several weeks without his mother's consent. *Id*. Price's mother later sued the hospital's medical director for administering ECT to her son. *Id*. at 907.

When we decided *Price*, the statute in effect at the time—the Minnesota Hospitalization and Commitment Act of 1967—did not include the language we interpret today: "necessary to preserve the life or health of any committed patient." *See* Minn. Stat. §§ 253A.01–.21 (1976).[10] In fact, although the statute contained provisions for obtaining consent "for a surgical operation necessary to save the life, health, eyesight, hearing, or a

---

[9]    In *Price* we used the term "electroshock therapy." 239 N.W.2d at 908. Because the medical community now refers to this procedure as electroconvulsive therapy, or ECT, we use the medically updated terms in this opinion.

[10]    The Minnesota Commitment Act of 1982 repealed the prior version of the commitment statute that we reviewed in *Price*. *See* Act of Mar. 22, 1982, ch. 581, §§ 1–26, 1982 Minn. Laws 1329, 1329–59 (codified as amended at Minn. Stat. §§ 253B.01–.23). The 1982 law included the statutory language we consider here but excluded "the treatment of mental illness" from the "medical or surgical treatment" covered by that subdivision. *See id.* at § 3, subd. 6, 1982 Minn. Laws at 1332 (codified as amended at Minn. Stat. § 253B.03, subd. 6). In 1991, Minn. Stat. § 253B.03, subd. 6, was amended to narrow its exclusion to only "nonintrusive treatment for mental illness." Act of May 22, 1991, ch. 148, § 2, 1991 Minn. Laws 308, 309 (codified as amended at Minn. Stat. § 253B.03, subd. 6).

limb of any patient,"[11] it did not recognize a committed individual's right to consent to any mental health treatment, nor did it require any court order to authorize such treatment. Minn. Stat. § 253A.17, subd. 8 (1967). Consequently, the question before us in *Price* was whether the hospital involuntarily administering ECT to Price violated his constitutional right to privacy, not whether it violated the civil commitment statute.[12] 239 N.W.2d at 908. It was the *Price* decision that required treatment facilities to petition for court orders and district courts to decide these petitions using the criteria outlined, even though the statute at that time did not require consent or a court order to administer intrusive mental health treatments. *Id.* at 912–13; *see* Minn. Stat. § 253A.17, subd. 8 (1967).

In *Price*, we explained that at the core of the fundamental constitutional right to privacy is "the concept of personal autonomy—the notion that the Constitution reserves to the individual, free of governmental intrusion, certain fundamental decisions about how he or she will conduct his or her life." 239 N.W.2d at 910. We acknowledged that, "[l]ike other constitutional rights, . . . this right is not an absolute one and must give way to certain interests of the state, the balance turning on the impact of the decision on the life of the

---

[11] The head of a state hospital was able to obtain consent from a patient if the patient had "sufficient capacity to make a responsible decision." Minn. Stat. § 253A.17, subd. 8 (1967). Otherwise, the statute provided for obtaining consent from a relative, guardian, or the head of the state hospital in certain circumstances. *Id*.

[12] We considered other issues in *Price* not relevant to this appeal, including whether ECT constitutes cruel and unusual punishment under the Eighth Amendment and whether the state hospital director is immune from lawsuit as a state official. 239 N.W.2d at 907. We affirmed the dismissal of these claims on qualified immunity grounds. *Id*. at 912.

11

individual." *Id*. We concluded that, in civil commitments, the state has a legitimate interest in treating a committed patient. *Id*. at 911.

In our *Price* opinion, we determined that the constitutional right to privacy requires that imposing intrusive forms of treatment not be "solely within the discretion of medical personnel at our state hospitals." *Id*. at 912–13. Accordingly, we adopted a procedure for treatment facilities to request court orders to authorize involuntary, intrusive mental health treatment with ECT. *Id*. at 913. In the absence of a patient's or guardian's consent, we required a treatment facility to petition a district court for an order authorizing the treatment. *Id*. We held that, in an adversarial proceeding, the district court must determine whether the prescribed treatment is "necessary and reasonable" to justify infringing on an individual's constitutional right to privacy. *Id*. And we outlined how district courts should make this determination:

> the court should balance the patient's *need for treatment against the intrusiveness of the prescribed treatment*. Factors which should be considered are (1) the extent and duration of changes in behavior patterns and mental activity effected by the treatment, (2) the risks of adverse side effects, (3) the experimental nature of the treatment, (4) its acceptance by the medical community of this state, (5) the extent of intrusion into the patient's body and the pain connected with the treatment, and (6) the patient's ability to competently determine for himself whether the treatment is desirable.

*Id*. (emphasis added). Although we did not list all intrusive forms of treatment subject to these procedures and the attendant analysis, we specifically observed that district courts are required to conduct this analysis for psychosurgery and ECT.[13] *Id*. Since our *Price*

---

[13] Ultimately, we did not decide whether ECT was necessary and reasonable for Price because we affirmed the dismissal of the claim on other grounds. *Id*. at 913.

12

decision in 1976, district courts have applied this test in evaluating petitions seeking authorization to involuntarily administer ECT, balancing the need for treatment against its intrusiveness, and considering the factors we outlined.

We affirmed *Price* in *Jarvis*, holding that the *Price* test applies to all intrusive treatments for mental illness—including administering neuroleptic medication—and that treatment facilities must, therefore, obtain court orders to administer neuroleptic medication without consent.[14] *Jarvis*, 418 N.W.2d at 150. While the constitutional privacy interests we cited in *Price* were rooted in the federal constitution, in *Jarvis*, we held that the right to privacy separately emanated from the Minnesota Constitution. *Id*. at 147–48. We decided *Jarvis* "exclusively under Minnesota statutes and our Minnesota Constitution" because of the importance of "our obligation to be independently responsible for safeguarding the rights of our citizens."[15] *Id*. (citation omitted) (internal quotation marks omitted). In the years since *Price* and *Jarvis*, district courts have continued to apply the *Price*/*Jarvis* test, balancing the need for treatment against its intrusiveness and considering the six factors outlined in *Price*.[16] *See, e.g.*, *In re Commitment of Tefera*, No. A10-1770,

---

[14]     Authorizing neuroleptic medication is now governed by Minn. Stat. § 253B.092.

[15]     Medical and legal professionals frequently refer to judicial proceedings regarding whether to authorize treatment for patients unable or unwilling to consent as "*Jarvis* hearings." *E.g.*, *Matter of Peterson*, 446 N.W.2d 669, 670–71 (Minn. App. 1989) (stating that the district court conducted a "*Jarvis* hearing" when a medical director sought to override the Treatment Review Panel's denial of a hospital's petition to involuntarily administer neuroleptic medications on Peterson.)

[16]     The Legislature added the phrase at issue here—"necessary to preserve the life or health of any committed patient"—after *Price*, but before *Jarvis*. Act of Mar. 22, 1982,

13

2011 WL 781353, at *2 (Minn. App. Mar. 8, 2011) (stating that the district court must consider the *Price* balancing factors to determine the necessity and reasonableness of an intrusive treatment such as ECT); *In re Commitment of DeRosia*, No. A19-1350, 2020 WL 877054, at *4 (Minn. App. Feb. 24, 2020) (acknowledging that the district court applied the *Price* test when analyzing a request to administer neuroleptic medications to DeRosia).

B.

The statute we interpret today, found in the current Minnesota Commitment and Treatment Act, establishes civilly committed patients' rights and the procedures that apply to civil commitments. Minn. Stat. § 253B.03. Among those enumerated rights is the patient's right to consent to treatment:

> (a) A patient has the right to give prior consent to any medical or surgical treatment, other than treatment for chemical dependency or nonintrusive treatment for mental illness.

> (b) The following procedures shall be used to obtain consent for any treatment *necessary to preserve the life or health* of any committed patient[.]

---

ch. 581, § 3, 1982 Minn. Laws 1329, 1332 (codified as amended at Minn. Stat. § 253B.03, subd. 6). Despite this amendment, the commitment statute still provided committed patients the right to consent only to medical and surgical treatments. Minn. Stat. § 253B.03, subd. 6 (1982) (providing that "[a] patient has the right to prior consent to any medical or surgical treatment, other than the treatment of mental illness, mental retardation or chemical dependency."). It was not until 1991 that the Legislature amended the statute to provide patients with the right to consent to intrusive mental health treatment. Act of May 22, 1991, ch. 148, § 2, 1991 Minn. Laws 308, 309 (codified as amended at Minn. Stat. § 253B.03, subd. 6).

*Id.*, subd. 6 (emphasis added).[17] The subsections that follow outline the methods for obtaining consent to the treatment requested, including getting written, informed consent from a patient, patient's guardian, authorized representative, or relative, and providing that, when such consent cannot be obtained, the head of a treatment facility or a state-operated treatment program, or an interested person, may petition the district court for an order authorizing the treatment. *Id.*, subd. 6(b)(1)–(3). The statute does not specify considerations a court must evaluate in deciding whether to authorize such treatment, nor does it require the court to make any particular findings before authorizing treatment.

Graeber argues that the current language of Minn. Stat. § 253B.03, subd. 6(b)—which states, "[t]he following procedures shall be used to obtain consent for any treatment necessary to preserve the life or health of any committed patient"— requires a district court to make a threshold determination that the proposed treatment is necessary to preserve a patient's life or health before applying the *Price/Jarvis* balancing test. Respondent Dakota County Social Services (the County) opposes Graeber's proposed two-step analysis, arguing that Graeber's reading of "necessary to preserve the life or health" in Minn. Stat. § 253B.03, subd. 6(b), is unreasonably narrow and would only allow physicians to petition for treatment when necessary to save a patient's life.

To decide whether the *Price/Jarvis* balancing test necessarily and adequately addresses the statutory phrase "treatment necessary to preserve the life or health," we must

---

[17] Minnesota Statutes section 253B.03 has multiple subdivisions addressing consent in different circumstances. All parties agree that the consent provisions in Minn. Stat. § 253B.03, subd. 6, apply to this case.

first determine what this phrase means. This is a question of statutory interpretation, which we review de novo. *In re Benson*, 12 N.W.3d 711, 715 (Minn. 2024).

"The object of all interpretation and construction of laws is to ascertain and effectuate the intention of the legislature." Minn. Stat. § 645.16. "[W]hen interpreting a statute, the first step is to determine whether the plain language of the statute is ambiguous." *State v. Moore*, 10 N.W.3d 676, 680 (Minn. 2024). When the plain language of a statute is unambiguous, then the plain meaning controls. *Id.* If, however, the plain language of the statute is subject to "more than one reasonable interpretation," the statute is ambiguous. *Benson*, 12 N.W.3d at 715 (citation omitted) (internal quotations omitted). Only if we conclude the language is ambiguous will we go beyond the plain language of the statute to determine the Legislature's intent. *Id.* at 715. In assessing a statute's words and phrases, we construe the language "according to [its] common and approved usage." Minn. Stat. § 645.08(1).

Accordingly, we begin our interpretation of the statutory language "treatment necessary to preserve the life or health of any committed patient" in Minn. Stat. § 253B.03, subd. 6(b), by examining the plain language. We have not previously interpreted this phrase, and the statute does not define the words at the heart of the parties' dispute: "preserve" and "health."[18] "When the Legislature has not provided definitions of the

---

[18] Chapter 253B defines "health officer," in the context of the Minnesota Commitment and Treatment Act, to include medical professionals like physicians and nurses, as well as mental health professionals and social workers. Minn. Stat. § 253B.02, subd. 9. Although not defining "health," this related definition suggests that the Legislature has not limited "health" as used in Chapter 253B to mean only *physical* health.

16

relevant terms, we may consider dictionary definitions to determine a word's common usage." *State v. Cummings*, 2 N.W.3d 528, 533 (Minn. 2024).

Both parties assert the statute's plain meaning is unambiguous. Graeber argues that "preserve" means to "keep safe from injury, harm, or destruction: protect." *Merriam-Webster's Collegiate Dictionary* 982 (11th ed. 2003) (defining "preserve" as "to keep safe from injury, harm, or destruction: protect"). Here, because she believes that no injury, harm, or destruction will occur if she does not receive ECT, Graeber asserts that her health does not need protection. As such, Graeber's narrow interpretation would allow treatment only to maintain a patient's current condition and prevent their health from deteriorating. The County, on the other hand, focuses on the word "health" in arguing for a broader interpretation to include treatments that provide relief from symptoms negatively impacting a person's mental health.[19] The County argues that "health," as it is used in the statute, means "the condition of being sound in body, mind, or spirit." *Id.* at 574 (defining "health" as "the condition of being sound in body, mind, or spirit; *esp*: freedom from

---

[19] The Department of Human Services, as amicus curiae, suggests we consider how the Legislature has defined the phrase "medically necessary." For example, in the context of insurance coverage for mental health services, Minn. Stat. § 62Q.53, subd. 2, defines "medically necessary care" as:

> [H]ealth care services appropriate, in terms of type, frequency, level, setting, and duration, to the enrollee's diagnosis or condition, and diagnostic testing and preventive services. Medically necessary care must be consistent with generally accepted practice parameters as determined by health care providers in the same or similar general specialty as typically manages the condition, procedure, or treatment at issue and must: (1) help restore or maintain the enrollee's health; or (2) prevent deterioration of the enrollee's condition.

17

physical disease or pain"). Under the County's broader interpretation, preserving health could include treatments that would improve a patient's current condition so that the patient would be "sound in body, mind, or spirit."[20]

When we consider competing dictionary definitions, "we evaluate and reject various definitions until we ascertain the only reasonable definition." *Cummings*, 2 N.W.3d at 534. We have also observed that the "relevant definition of a term depends on the context in which the term is used." *State v. Nelson*, 842 N.W.2d 433, 437 n.2 (Minn. 2014).

We conclude that Graeber's narrow interpretation of the language "treatment necessary to preserve the life or health of any committed patient" in Minn. Stat. § 253B.03, subd. 6(b), is not reasonable in the context of this statute. Graeber's suggested dictionary definition of "preserve" is not in itself problematic. But Graeber argues that because "preserve" means to "keep safe from injury, harm, or destruction: protect," intrusive mental health treatments cannot be administered without a patient's consent unless the patient will suffer injury, harm, or destruction without such treatments. *See Merriam-Webster's Collegiate Dictionary* 982 (11th ed. 2003). The problem with this proposed interpretation is Graeber's reliance on the isolated meaning of "preserve" without considering the interaction between "preserve" and "health" in the context of the statutory phrase "necessary to preserve the life or health." *See* Minn. Stat. § 253B.03, subd. 6(b). If a

---

[20] While Graeber did not propose a definition for "health", she acknowledged that "health" may be defined in part as "the condition of being sound in body, mind, or spirit." She argued, however, that the definitions of health "primarily focus[] on physical health," such as "freedom from physical disease or pain." In oral argument, Graeber conceded that "health" here must mean more than freedom from physical disease or pain.

person's health means the "condition of being sound in body, mind, or spirit," preserving or protecting a person's health means protecting a person's *sound condition* or healthiness. *See Merriam-Webster's Collegiate Dictionary* 574 (11th ed. 2003). While Graeber's interpretation might make sense for a currently healthy person, for a person who is injured or ill this interpretation would mean that the statute was intended to maintain their injury or disease in its current condition rather than restoring health. Under Graeber's interpretation, a court could never authorize an intrusive mental health treatment to improve a civilly committed person's mental health, no matter how badly the person's mental health had deteriorated. This cannot be a reasonable interpretation of this statute.

Accordingly, we conclude that Graeber's narrow interpretation of "necessary to preserve the life or health of a committed patient," which results in merely maintaining the status quo for civilly committed patients with serious and persistent mental illness, is not reasonable. We reject this narrow definition in favor of a broader interpretation that appropriately considers the meaning and relationship between the terms "preserve" and "health," and which includes treatments that alleviate mental illness's harmful symptoms in order to restore a person's health.

## C.

Finally, we turn to the question of the ongoing validity of the *Price*/*Jarvis* balancing test. This question is not one of statutory interpretation but rather interpreting our own jurisprudence. Graeber asserts that the statutory language "treatment necessary to preserve the life or health of any committed patient" in Minn. Stat. § 253B.03, subd. 6(b), is a separate requirement in addition to the *Price*/*Jarvis* factors because those six factors do not

address that specific statutory requirement. Graeber advocates for a new rule of law that would require district courts to first analyze whether treatment is "necessary to preserve the life or health" of a committed individual and then apply the *Price*/*Jarvis* balancing test before deciding whether to authorize intrusive mental health treatment. As such, we must decide whether our *Price*/*Jarvis* balancing test adequately addresses the "necessary to preserve the life or health" language of Minn. Stat. § 253B.03, subd. 6(b). After comparing the two, we conclude that it does.

First, we examine the statutory language. Having concluded that Graeber's narrow interpretation of the phrase "necessary to preserve the life or health" is unreasonable, we interpret the statutory phrase at issue as including treatments that alleviate harmful mental illness symptoms in order to restore a person's health. Yet even with this broader interpretation, the statutory language remains focused on the *necessity* of such treatment.

The *Price*/*Jarvis* balancing test, however, addresses *two* fundamental concerns: necessity and intrusiveness. *Price*, 239 N.W.2d at 910. In *Price*, we described the first concern, necessity, as the "need for treatment." *Id*. at 913. As such, under the *Price*/*Jarvis* balancing test, a district court must assess the necessity of the proposed treatment, which requires the court to consider the patient's current condition and symptoms. *See id.* at 911–12. And district courts must weigh the necessity of the treatment against the second consideration, the treatment's intrusiveness, which focuses on whether the intrusion is reasonable, or "in light of alternative means, the least intrusive"—the salient consideration in a constitutional privacy analysis. *Id*. at 910.

20

Consequently, we conclude that the concern underlying the statute's language—that treatment be "necessary to preserve the life or health" of the committed patient—is fundamentally the same concern for necessity that the *Price/Jarvis* test addresses: the need for the treatment. As such, our *Price/Jarvis* balancing test adequately addresses the "treatment necessary to preserve the life or health" language of Minn. Stat. § 253B.03, subd. 6(b), and also provides additional, important protection for patients' constitutional privacy rights. *See Price*, 239 N.W.2d at 910–11; *Jarvis*, 418 N.W.2d at 148–50. Therefore, when a district court makes the required findings under the *Price/Jarvis* balancing test that a treatment is both necessary and reasonable (i.e., the least intrusive means available), such a finding satisfies not only the important individual constitutional privacy interests but also adequately addresses the statutory language.

Graeber's argument and the dissent's reasoning disregard the overarching concern of our *Price/Jarvis* balancing test. Graeber and the dissent focus on the six factors listed in *Price*, arguing that the factors do not address whether a treatment is "necessary to preserve life or health." But the *Price/Jarvis* balancing test involves more than analyzing the six outlined factors. Those factors guide a district court's analysis of one half of the balancing test: reasonableness—the extent of the proposed treatment's intrusion on an individual's privacy interest. The second half of the balancing test requires the district court to weigh "the patient's need for treatment against the intrusiveness of the prescribed treatment." *Price*, 239 N.W.2d at 913. Ultimately, district courts are tasked with weighing both important principles: necessity and reasonableness. Because the test requires district courts to make a finding that the treatment is both "necessary and reasonable" in order to

21

authorize treatment, it necessarily encompasses a patient's need for treatment. *Id.* We therefore conclude that this careful and detailed inquiry[21] satisfies the "treatment necessary to preserve the life or health" language of Minn. Stat. § 253B.03, subd. 6(b).

In sum, the Legislature did not create a separate test, in addition to the *Price*/*Jarvis* balancing test, by requiring that district courts consider whether a treatment is "necessary to preserve the life or health of any committed patient" in deciding whether to authorize that treatment under the Minnesota Commitment and Treatment Act.[22] In the past thirty-

---

[21] District courts must ensure they address the entirety of the *Price* analysis, which requires courts to balance a patient's need for treatment against the intrusiveness of the prescribed treatment. Courts must make express findings regarding all six factors, as well as whether the prescribed treatment is both necessary and reasonable.

[22] The dissent concludes "necessary to preserve the life or health" in Minn. Stat. § 253B.03, subd. 6(b), imposes an independent procedural requirement that district courts must address before applying the *Price*/*Jarvis* balancing test, but never interprets the statutory language itself. Nonetheless, the dissent concludes that the necessity prong of the *Price*/*Jarvis* balancing test does not adequately address the undefined statutory language. The dissent describes the statutory requirement as a "threshold" or serving a "gatekeeping" function. Without defining the statutory language, however, it is unclear whether the dissent interprets this threshold requirement as a low or high bar relative to the *Price/Jarvis* balancing test. If it is a lower bar, it would be meaningless to require a district court to make such a finding before applying the *Price/Jarvis* test. If it is a higher bar that requires analysis of something more than the patient's need for treatment, this interpretation would render the *Price/Jarvis* test moot.

Further, had the Legislature intended to direct district courts to make a threshold finding before weighing necessity and reasonableness under the *Price/Jarvis* balancing test in determining whether to authorize intrusive treatments such as ECT, it could have "done so explicitly—just as it has in other statutes." *Benson*, 12 N.W.3d at 717; *see, e.g.*, *id.* (concluding a right was waivable because the Legislature did not say it was unwaivable, as it had done in other statutes); *State v. Cloutier*, 987 N.W.2d 214, 223 (Minn. 2023) (concluding that if the Legislature had intended to change the State's burden of proof in restitution cases, it would have done so directly). With respect to administration of neuroleptic medications to civilly committed individuals, for example, the Legislature enacted language to require findings regarding a patient's capacity to make decisions under

22

plus years that this statutory language and the *Price*/*Jarvis* balancing test have been in effect, although the Legislature has amended the Minnesota Commitment and Treatment Act, it has not amended it to require district courts to make findings beyond those required under the *Price*/*Jarvis* balancing test. This supports our conclusion that the *Price*/*Jarvis* balancing test addresses both constitutional privacy interests and the statutory language governing authorizing treatment procedures and remains valid.

*   *   *

We affirm the validity of our longstanding *Price*/*Jarvis* balancing test, which provides essential protections to civilly committed individuals in Minnesota. The test ensures that treatment facilities may not impose involuntary intrusive treatments such as ECT without a court first determining that the treatment is "necessary and reasonable," after balancing the patient's need for the treatment and the intrusiveness of the treatment. *See Price*, 239 N.W.2d at 910. We hold that the *Price*/*Jarvis* balancing test not only protects an individual's constitutional right to privacy, but it adequately addresses the

---

Minn. Stat. § 253B.092 after we pointed out that mentally ill persons may be competent to make some medical decisions in *Jarvis*. *Compare Jarvis,* 418 N.W.2d at 148 n.7 (noting that "mentally ill persons may be competent to make some medical decisions" and expressing our view that "a finding of legal incompetence is a prerequisite to involuntary medication with neuroleptics"), *with* Act of May 22, 1997, ch. 217, § 60, 1997 Minn. Laws 2138, 2161 (codified at Minn. Stat. § 253B.092, subd. 6(d) (1997)) (stating, in the context of authorizing administration of neuroleptic medications, that "the court *shall make findings* regarding the patient's capacity to make decisions" (emphasis added)). The Legislature did not, however, include language in the statute explicitly requiring district courts to make any particular findings before performing the *Price/Jarvis* balancing test. If the Legislature had wished to impose a threshold finding or change the *Price*/*Jarvis* balancing test, the Legislature was capable of doing so outright, as it did with the 1997 amendments requiring findings regarding a patient's capacity to make decisions after our 1988 *Jarvis* decision.

23

"necessary to preserve the life or health of any committed patient" language of Minn. Stat. § 253B.03, subd. 6(b).

## CONCLUSION

For the foregoing reasons, we affirm the decision of the court of appeals.

Affirmed.

D I S S E N T

PROCACCINI, Justice (dissenting).

I respectfully dissent. I would conclude that the phrase "necessary to preserve the life or health of any committed patient" in Minnesota Statutes section 253B.03, subdivision 6(b), imposes a threshold requirement for hospitals to petition courts for authorization to administer intrusive treatment to committed patients. This statutory threshold requirement and the constitutional balancing test outlined in *Price v. Sheppard*, 239 N.W.2d 905 (Minn. 1976), are different requirements that must be independently addressed before a court may order a patient to undergo involuntary electroconvulsive therapy (ECT).

Because the statutory threshold requirement and the constitutional balancing test impose distinct procedural requirements and answer different substantive questions, I would hold that a district court errs when—as happened here—it does not consider the statutory threshold requirement independently and determine whether the treatment sought is "necessary to preserve the life or health" of the patient.

A.

Attempts to reconcile the subdivision 6(b) statutory threshold requirement and the constitutional balancing test by subsuming one within the other fail because they are simply different—both procedurally and substantively. Procedurally, the statutory threshold requirement plays a gatekeeping function, establishing *when* a hospital can seek consent to administer intrusive treatment to a committed patient via a court petition under subdivision 6(b)(3). And courts apply the constitutional balancing test when deciding

D-1

whether to authorize intrusive treatment sought in such a petition, addressing the appropriateness of the intrusion posed by a particular treatment. Substantively, the statutory threshold requirement and the constitutional balancing test ask different questions that cannot be applied interchangeably. As addressed below, these differences make sense in light of the different purposes served by the statutory threshold requirement and constitutional balancing test, as well as the history of their development.

To start, the statutory threshold requirement is not subsumed within the constitutional balancing test because it is an independent procedural requirement that plays a distinct role. Together, the statutory threshold requirement and the constitutional balancing test call for a two-step procedure for the district court to follow when a hospital seeks to administer intrusive treatment to a non-consenting committed patient.

The first step is the express statutory threshold requirement that the treatment to be administered is "necessary to preserve the life or health of [the] committed patient." Minn. Stat. § 253B.03, subd. 6(b). Subdivision 6(b) functions as a gatekeeper. It explains *when* a hospital may seek consent via a court petition to administer intrusive treatment to a committed patient under subdivision 6(b)(3). Subdivision 6 begins by establishing the baseline principle that "[a] patient has the right to give prior consent to any medical or surgical treatment, other than treatment for chemical dependency or nonintrusive treatment for mental illness."[1] *Id.*, subd. 6(a). Having codified the right of all patients to consent to treatment, the statute explains that "[t]he following procedures shall be used to obtain

---

[1] The parties agree that ECT is not "nonintrusive treatment for mental illness."

consent *for any treatment necessary to preserve the life or health* of any committed patient[.]" *Id.*, subd. 6(b) (emphasis added.)  The statute then delineates five procedures that may be used to obtain such consent.[2]  *Id.*  Subdivision 6(b)(3), the provision at the center of this case and one of the five consent procedures, allows the "head of the treatment facility or state -operated treatment program or an interested person" to "petition the committing court for approval for the treatment" in certain circumstances.

Under the express statutory language, approval under subdivision 6(b)(3) is available only if the treatment sought is "necessary to preserve the life or health of any committed patient" and when the other prerequisites of subdivision 6(b)(3) are met.[3] Unless and until this threshold requirement is met, a hospital cannot petition the committing court to obtain consent to administer intrusive treatment to a non-consenting

---

[2]    In addition to the consent procedure at issue here, subdivision 6(b) specifies that consent may also be obtained from "a competent adult patient" if that consent is informed and in writing.  Minn. Stat. § 253B.03, subd. 6(b)(1).  And consent can also be obtained from a guardian, if the patient is subject to guardianship, and the guardian's consent is informed and in writing.  *Id.*, subd. 6(b)(2).  The subdivision also establishes procedures relating to obtaining consent from minors.  *Id.*, subd. 6(b)(4).  Finally, the subdivision provides that the head of the treatment facility, in cases of emergency, may provide consent "when the persons ordinarily qualified to give consent cannot be located in sufficient time to address the emergency need."  *Id.*, subd. 6(b)(5).

[3]    Under subdivision 6(b)(3), "written, informed consent" must be obtained from either "the person appointed the health care power of attorney, the patient's agent under the health care directive, or the nearest proper relative."  Minn. Stat. § 253B.03, subd. 6(b)(3).  Only if the patient's nearest proper relatives "cannot be located, refuse to consent to the procedure, or are unable to consent" can "the head of the treatment facility or state-operated treatment program or an interested person . . . petition the committing court for approval for the treatment."  *Id.*

committed patient.[4]  Accordingly, a determination that the treatment sought is "necessary to preserve" the committed patient's "life or health" is an express statutory threshold requirement that the committing court must make to determine whether a petition is properly before it under subdivision 6(b)(3).[5]

If the hospital can petition the court for consent under subdivision 6(b)(3) because the treatment sought is necessary to preserve the committed patient's life or health, then the court must consider whether it should authorize the treatment.  This brings us to the second step—the constitutional balancing test.  Our 1976 decision in *Price* (predating subdivision 6's amendment providing patients with the right to consent to intrusive mental health treatment by approximately 15 years),[6] set forth a constitutional balancing test that courts must apply when deciding whether to authorize intrusive treatment against a committed patient's wishes.  239 N.W.2d at 912–13.  We also recognized "that 'intrusive'

---

[4]      The parties do not argue that any mechanism apart from subdivision 6(b)(3) allows hospitals to obtain consent under the circumstances presented here.

[5]      This is not a case where the Legislature failed to speak.  *Contra In re Benson*, 12 N.W.3d 711, 717 (Minn. 2024).  Here, the Legislature expressly cabined the subdivision 6(b)(3) petitioning process within the "procedures [that] shall be used to obtain consent for any treatment necessary to preserve the life or health of any committed patient[.]"  Just as subdivision 6(b) does not authorize a hospital to bring a subdivision 6(b)(3) petition to obtain consent to treat a non-committed patient, it likewise does not authorize a subdivision 6(b)(3) petition to obtain consent for treatment that is not necessary to preserve life or health.  Although it is true that the Legislature did not expressly instruct district courts to make specific findings related to necessity, the lack of such an instruction is not an invitation for hospitals or district courts to disobey a clear legislative mandate.  Courts, of course, must faithfully apply the law—whether or not they are expressly told to do so.

[6]      *See* Act of May 22, 1991, ch. 148, § 2, 1991 Minn. Laws 308, 309 (codified as amended at Minn. Stat. § 253B.03, subd. 6).

forms of treatment seriously infringe upon a committed mental patient's right of privacy." *Jarvis v. Levine*, 418 N.W.2d 139, 144 (Minn. 1988) (quoting *Price*, 239 N.W.2d at 910).[7] To protect committed patients, *Price* established pre-treatment judicial review procedures to be used before the imposition of intrusive treatment on non-consenting patients. 239 N.W.2d at 913. For such intrusive treatments, *Price* required the district court to "determine the necessity and reasonableness of the prescribed treatment" by "balanc[ing] the patient's need for treatment against the intrusiveness of the prescribed treatment." *Id.* We set out six factors to guide this determination:

> [T]he court should balance the patient's need for treatment against the intrusiveness of the prescribed treatment. Factors which should be considered are (1) the extent and duration of changes in behavior patterns and mental activity effected by the treatment, (2) the risks of adverse side effects, (3) the experimental nature of the treatment, (4) its acceptance by the medical community of this state, (5) the extent of intrusion into the patient's body and the pain connected with the treatment, and (6) the patient's ability to competently determine for himself whether the treatment is desirable.

*Id.*

Taken together, the subdivision 6(b) threshold requirement and the *Price/Jarvis* balancing test constitute a two-step procedure. Courts considering petitions under subdivision 6(b)(3) must first address the statutory threshold requirement—whether the hospital may obtain consent via a petition to the committing court under subdivision 6(b)(3). If a hospital cannot show that the treatment sought is "necessary to preserve the life or health" of the committed patient, then the hospital does not meet the

---

[7] In *Jarvis*, we reaffirmed *Price* and held that—under the Minnesota Constitution— the balancing test set forth in *Price* applies to all involuntary intrusive treatments for mental illness, including the administration of neuroleptic medication. *Jarvis*, 418 N.W.2d at 145.

statutory threshold requirement and cannot petition for consent under subdivision 6(b)(3). If the hospital meets the statutory threshold requirement, then the court must apply the constitutional balancing test to determine whether the administration of the petitioned treatment comports with the committed patient's constitutional privacy rights.[8] Because the statutory threshold requirement is a *prerequisite* to a hospital's petition to obtain consent from the court, collapsing that requirement into the constitutional balancing test to be weighed simultaneously among other factors effectively nullifies its procedural function.

But the problem with subsuming the statutory threshold requirement in the constitutional balancing test is not merely procedural—it is also substantive. Because each poses a different question and requires a substantively distinct analysis, answering one question does not necessarily answer the other. The constitutional balancing test simply does not address the statutory threshold requirement that the treatment be "necessary to preserve the life or health" of the patient. In this sense, subsuming the statutory threshold requirement within the constitutional balancing test is like replacing a hurdle with a seesaw.

---

[8]    This two-step approach also addresses several issues with a combined approach. A combined approach inextricably embeds a statutory threshold requirement within a constitutional balancing test that need only be reached if the petition is properly before the court. Such an approach is needlessly confusing, as it forces district courts to answer two different and distinct questions with a six-factor balancing test. A combined approach is also inefficient because a court cannot dispose of an impermissible petition without first conducting the full six-factor constitutional balancing test. It is unwise for district courts to conduct both simultaneously. Although there may be overlap between the statutory threshold requirement and the constitutional balancing test, separating the two steps streamlines and clarifies the required analysis.

Although it is true the constitutional balancing test calls for a determination of whether the proposed treatment is "necessary" and "reasonable," *Price* also explained that a district court must make that determination by conducting a balancing assessment with reference to the six factors. 239 N.W.2d at 913. But an evaluation of necessity, and specifically the necessity to *preserve* the patient's life or health, is absent from all six of the factors. *See id.* In other words, none of the factors addresses the basic question posed by subdivision 6(b): Is the requested intrusive treatment necessary to preserve the life or health of the patient? That question plainly requires a focus on the patient's condition, and such a focus is absent from the factors set out in *Price*. The first factor addresses efficacy (the extent and longevity of the impacts of the proposed treatment) and not whether the patient needs treatment. The second factor (the risk of adverse side effects) also plainly does not help a court assess the patient's condition or whether an intrusive treatment is needed. The third and fourth factors likewise focus on risk (experimental treatments) and efficacy (general acceptance), and they again do not relate to whether a patient *needs* an invasive treatment. The fifth factor looks at the level of intrusion and pain associated with the treatment—once again failing to answer whether a treatment is needed in the first place. And, finally, the sixth factor considers whether the patient has capacity to consent—a factor irrelevant to whether the patient needs the treatment.

Furthermore, the constitutional balancing test contemplates that the level of authorized intrusiveness will vary based on the patient's relative need for the treatment. On this sliding scale, as a patient's need for treatment increases, so does the authorized level of intrusiveness. And, conversely, a minimally invasive treatment may be authorized

when the need for treatment is not as great. This sliding-scale approach comports with *Price*'s admonition that—given the paramount importance of a patient's privacy rights—when the government intrudes on those rights over the objection of a patient, the means of the intrusion "must, in light of the alternatives, be the least intrusive." 239 N.W.2d at 911. But this balancing test does not help a court determine the threshold statutory requirement of whether a patient's condition is such that intrusive treatment is necessary to preserve their life or health. Indeed, the *Price/Jarvis* test implies that some treatments may well pass constitutional muster even if they are not necessary to preserve a patient's life or health.

The substantive distinctions highlighted above make sense when one considers the different purposes that underlie the statutory threshold requirement and the constitutional balancing test. In *Price*, and later in *Jarvis*, we were focused on vindicating committed patients' state and federal constitutional rights to be free of unwanted and excessive government intrusions into their bodily autonomy. *Price*, 239 N.W.2d at 910–911; *Jarvis*, 418 N.W.2d at 144, 146–47. The purpose of subdivision 6 is related but not identical. In crafting subdivision 6, the Legislature was focused on ensuring that patients have a right to provide prior consent to certain types of medical treatments by, in particular, formalizing the ways in which prior consent can be effectuated. *See* Minn. Stat. § 253B.03, subd. 1 ("A patient has the right to give prior consent to any medical or surgical treatment, other than treatment for chemical dependency or nonintrusive treatment for mental illness.").

Finally, the conclusion that the statutory threshold requirement and the constitutional balancing test are distinct is only reinforced by the chronology of their

development. It is illogical to conclude that *Price*—decided in 1976 and focused on a patient's constitutional rights to privacy—anticipated and fully accounted for a statutory requirement that the Legislature adopted in 1991 protecting a patient's right to give prior consent to intrusive mental health treatments. *See* Act of May 22, 1991, ch. 148, § 2, 1991 Minn. Laws 308, 309–10 (codified as amended at Minn. Stat. § 253B.03, subd. 6). We have stated that "once we have interpreted a statute, . . . [o]ur interpretation becomes part of the statute as though written therein." *Hagen v. Steven Scott Mgmt., Inc.*, 963 N.W.2d 164, 174 (Minn. 2021) (citation omitted) (internal quotation marks omitted). But we have not stated that our interpretation of an issue, made in a different context and predating a statute, somehow becomes part of, and subsumes, the statutory language written by the Legislature. The plain language of the statute does not support such a proposition. And logic defies such a conclusion. Put simply, it is unreasonable to assume that statutory language made applicable to ECT by the Legislature in 1991 is subsumed by a rule of law that we articulated in an entirely different context in 1976.[9]

For these reasons, I would hold that a district court considering a petition under subdivision 6(b)(3) must: (1) determine whether the sought treatment is "necessary to preserve the life or health" of the committed patient; and if so, then (2) determine whether

---

[9]    Similarly, because *Jarvis* was decided three years before the Legislature amended section 253B.03 to provide patients with the right to consent to intrusive mental health treatment, this court had no occasion to reconcile the constitutional balancing test with the statutory threshold requirement in that case. *See Jarvis*, 418 N.W.2d at 148 n.7 (noting that the operative version of section 253B.03 did not apply to mental health treatment of any kind).

the administration of the treatment comports with the committed patient's privacy rights under the constitutional balancing test.

B.

Here, although the district court conducted a thorough constitutional balancing analysis, it did not address the statutory threshold requirement—whether ECT was necessary to preserve Graeber's life or health. The district court's order does not mention subdivision 6(b) or its "necessary to preserve" requirement; it merely incorporates Minnesota Statutes section 253B.03 by reference. Although the district court found that "[w]ithout ECT [Graeber's] condition will likely remain the same and may even deteriorate," its other findings suggest that it did *not* find that ECT was necessary to preserve Graeber's life or health. The district court found that Graeber "is functioning well in her current setting," that "there is no medical or physical emergency that needs to be treated with ECT," and that Graeber's "behavior patterns and mental activity has been stable for many years."

Because the district court applied only the constitutional balancing test and did not engage with the statutory threshold requirement, it is far from clear that the district court found that ECT was necessary to preserve Graeber's life or health. Accordingly, I would hold that the district court abused its discretion by failing to apply the correct legal standard when it neglected to conclude whether ECT was necessary to preserve Graeber's life or health as required by subdivision 6(b). *See State v. Storkamp*, 656 N.W.2d 539, 541 (Minn. 2017) ("A district court abuses its discretion when its ruling is based on an erroneous view of the law."). In reaching this conclusion, we need not further define "necessary to

preserve . . . life or health."[10]  The question before us on appeal is whether the district court's findings and conclusions applying the constitutional balancing test also satisfy the independent statutory threshold requirement imposed by Minnesota Statutes section 253B.03, subdivision 6(b).  The answer to that question is no.  The question before us is *not* whether ECT is in fact necessary to preserve Graeber's life or health.  Because defining "necessary to preserve . . . life or health" is not necessary to resolve the controversy before us, judicial restraint counsels that we decline to address the issue here.  *Lipka v. Minn. Sch. Emps. Ass'n, Loc. 1980*, 550 N.W.2d 618, 622 (Minn. 1996) ("[J]udicial restraint bids us to refrain from deciding any issue not essential to the disposition of the particular controversy before us.").

And, because it is unclear whether the district court would have made the same findings and conclusions had it applied the statutory threshold requirement, remand is appropriate.  *See State v. Mauer*, 741 N.W.2d 107, 116 (Minn. 2007) (holding that remand was appropriate because we could not be certain that the district court would have made the same findings of fact had it applied the correct legal standard).  The district court is in the best position to apply the statutory standard to the evidence in the record.  *See id.*; *Glacial Plains Coop. v. Chippewa Valley Ethanol Co.,* 912 N.W.2d 233, 237 (Minn. 2018)

---

[10]  As discussed above, because the level of necessity required under the constitutional balancing test is variable; it will be high in some cases and low in others, depending on the intrusiveness of the treatment.  This means that even if we were to define "necessary to preserve," we could not answer for each future case whether the level of necessity required under the statute is higher or lower than the variable level of necessity required under the constitutional balancing test.  This is one of the reasons that the constitutional balancing test and the statutory threshold requirement should be considered separately.

("It is for the district court, sitting in its role as factfinder, to weigh the evidence and apply the law . . . ."). I would therefore remand this case to the district court.

For these reasons, I respectfully dissent.


THISSEN, Justice (dissenting).

I join in the dissent of Justice Procaccini.


GAÏTAS, Justice (dissenting).

I join in the dissent of Justice Procaccini.